THE STATE OF OHIO, APPELLEE, *v.* WADDY, APPELLANT.

[Cite as *State v. Waddy* (1992), 63 Ohio St.3d 424.]

(No. 90–22—Submitted January 7, 1992—Decided April 15, 1992.)

426

*Michael Miller,* Prosecuting Attorney, and *Alan C. Travis,* for appellee.

*Tyack, Wright, & Turner, Carol A. Wright* and *Harry R. Rinehart,* for appellant.

ALICE ROBIE RESNICK, J.

## I

## Joinder

In his first and second propositions of law, Waddy challenges the joinder of the fifteen-count indictment with the six-count Paula Mason indictment.

Waddy argues, in his first proposition, that the joinder of the Wilson, Jackson, and Milligan crimes with the murder prejudiced him in the penalty phase. The court of appeals found no prejudice because the trial court specifically instructed the jury " * * * not to consider in any way the evidence pertaining to crimes committed by the defendant against other persons." However, Waddy argues that the instruction could not erase the evidence of the other crimes from the minds of the jurors.

Waddy assumes that the Wilson, Jackson, and Milligan crimes are irrelevant to whether he should be executed for murdering Mason. His assumption is erroneous. Waddy's record of criminal behavior is directly relevant to his "history, character and background," R.C. 2929.04(B), which a sentencing jury

must consider. Accordingly, Waddy's first proposition of law must be overruled.

In his second proposition of law, Waddy claims joinder denied him a fair trial. It is well settled that the law favors joinder; therefore, in order to prevail, Waddy must show that the trial court abused its discretion by joining the indictments. See *State v. Franklin* (1991), 62 Ohio St.3d 118, 122, 580 N.E.2d 1, 5.

The state argues that, had the offenses not been joined, evidence of each crime joined at trial would have been admissible at the trial of each of the others, pursuant to Evid.R. 404(B). See, *e.g., State v. Benner* (1988), 40 Ohio St.3d 301, 306, 533 N.E.2d 701, 708. Here, the evidence of the Wilson, Jackson, and Milligan crimes was relevant to Mason's murder. Red fibers like those found in Mason's apartment, in her car, and on the screwdriver apparently used to open her window were also found in Wilson's and Jackson's apartments. All these fibers were consistent with the red gloves in Waddy's closet. Thus, if Waddy raped Wilson and robbed Jackson, leaving red fibers in their apartments, that evidence tends to prove that he also murdered Mason and left red fibers in her apartment and car.

Additionally, the Wilson and Jackson crimes share a similar *modus operandi* with the murder. In each case, Waddy entered a woman's apartment at night; he bound the victim's wrists behind her back and tied her ankles; he used a knife; he called each victim a "bitch" (cf. *State v. Broom* [1988], 40 Ohio St.3d 277, 282, 533 N.E.2d 682, 690); he took the victim's car or car keys; and he stole or demanded bank cards or credit cards. The crimes occurred within a three-month period and within walking distance of each other. Cf. *State v. Jamison* (1990), 49 Ohio St.3d 182, 186, 552 N.E.2d 180, 184. Waddy points out that the crimes differ in some ways; however, such differences go to weight, not admissibility. *Id.,* 49 Ohio St.3d at 187, 552 N.E.2d at 185.

The Milligan crimes were admissible for a different reason. Milligan testified that Waddy, during a phone call, boasted of killing Mason. Both the call and the boast were part of Waddy's extortion plot against Milligan; without the whole story of the extortion, the jury could not have understood Milligan's highly probative testimony.

Finding no abuse of discretion, we conclude that joinder was proper, and overrule Waddy's second proposition of law.

## II

### Evidentiary Sufficiency

In his thirteenth proposition of law, Waddy asserts that the state failed to prove his guilt of the counts involving Mason. In his fifteenth, he makes the same assertion about the counts involving Jackson.

When a defendant challenges the legal sufficiency of the state's evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic.*) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. The weight and credibility of the evidence are left to the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

We reiterate these basic principles, not just for the sake of analytic completeness, but also because litigants too frequently ignore them. In several propositions of law, including these, Waddy in effect asks us to resolve evidentiary conflicts in his favor and substitute our evaluation of witness credibility for the jury's. This is not the first case to employ this tactic. See, *e.g., State v. Cooey* (1989), 46 Ohio St.3d 20, 25, 544 N.E.2d 895, 905; *Jamison, supra,* 49 Ohio St.3d at 191, 552 N.E.2d at 189; *State v. Tyler* (1990), 50 Ohio St.3d 24, 33, 553 N.E.2d 576, 589. We once again state that "[n]ot even in a capital case may we sit as a 'thirteenth juror,' * * * as to a judgment of conviction." (Citation omitted.) *Id.* at 33, 553 N.E.2d at 589. With that in mind, we turn to Waddy's contentions.

Waddy asserts that all the evidence tying him to Mason's murder was circumstantial[1] and argues that the evidence is not "irreconcilable with any reasonable theory of * * * innocence," citing *State v. Kulig* (1974), 37 Ohio St.2d 157, 66 O.O.2d 351, 309 N.E.2d 897, syllabus. However, our recent decision in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus, overruled *Kulig.* Circumstantial and direct evidence are now subject to the same standard of proof.

The evidence of Waddy's guilt includes his boast to Milligan that he had strangled a young woman at Jefferson and Broad. This statement inculpates Waddy in two ways. First, the state introduced evidence that the manner of Mason's death had not been released to the public; thus, only the killer would have known that Mason had been strangled. (Waddy points out that one witness testified that the manner of Mason's death was common knowledge in the neighborhood. But that, as we have noted, is a jury question. *DeHass, supra.*) Second, even had the details of the killing been widely known, Waddy's statement that he killed Mason obviously has independent probative force as an admission.

---

1. This is not so; Waddy's admission to Michael Milligan is direct, not circumstantial, evidence of guilt.

Another key element in the state's proof was trace evidence. Red fibers kept turning up where Waddy had been. Waddy had a pair of red gloves in his closet, and he left red fibers at the scenes of his other crimes. Thus, when red fibers found in Mason's apartment and car proved consistent with Waddy's gloves and with the fibers at the Jackson and Wilson crime scenes, the jury could infer that they came from Waddy. Moreover, one of the screwdrivers found near the Jeffersonian Apartments had on its handle not only a red fiber but a blue fiber that matched the material of a blue stocking hat found in Waddy's closet.

Other physical evidence firmly tied Waddy to the murder. His fingerprint was found on a plastic jewelry box left near Mason's residence. Mason owned an identical box, which was missing from her apartment after the murder. And the torn edge of the piece of white tape on the washcloth was "an exact match" with the edge of a similar roll of white tape found in Waddy's house. Thus, a reasonable jury could find that the piece of tape had been torn off that roll.

According to Greg Jefferson and Allen Russell, Waddy had Mason's credit card in his possession. A black male was seen shortly after Mason's death, driving Mason's car to Gay Street and Pearl Alley, near a bank that accepted Anytime Bank cards. Additionally, an Anytime Bank card was found in Mason's car. (Part of Waddy's *modus operandi* was stealing credit cards and bank cards, as shown by the Wilson, Jackson, and Milligan cases.) [2] Although the defense tried to blame Jefferson for the murder, the witness who saw the car testified that Jefferson was not the driver.

Finally, in addition to the red fibers, Mason's murder had several other features in common with the Wilson and Jackson crimes (see our discussion, *supra*, of Waddy's second proposition of law), indicating that a single individual committed all three.

On this evidence, a rational jury could find beyond a reasonable doubt that Waddy murdered Paula Mason. Waddy's thirteenth proposition is overruled.

In his fifteenth proposition of law, Waddy alleges that the evidence was legally insufficient to convict him of aggravated assault, aggravated robbery, and burglary in the Jackson case.

---

2. Milligan gave the following testimony regarding Waddy's interest in bank and credit cards:
   " * * * And he said it would have been a whole lot easier for me if I had answered the phone calls the first time around * * *.
   "Basically, he said if I had given the numbers for a bank machine for my Visa * * * and a bank card * * * he could have gone down to the little machine and gotten the bucks, and I would have gotten the stuff back a whole lot sooner."

Jackson identified Waddy's voice as the burglar's. Police found red fibers in the knots of Jackson's bindings; these fibers, like those found in Mason's and Wilson's apartments, were consistent with the red gloves found in Waddy's closet. Moreover, in the same closet were Jackson's car keys with their unique keychain. Jackson positively identified the keys and keychain.

Waddy testified that his daughter found the keys outdoors. He points out that the keys, which were not rusty when stolen, had rusted by the time police found them. Waddy claims that they could have become rusty only if left outdoors, but the record contains no evidence of that.

Waddy also tries to discredit Jackson's identification testimony by pointing to a minor memory lapse of hers and citing testimony of other witnesses. Again, we refuse to second-guess the jury's credibility determination. Based upon the evidence a rational jury could have believed Jackson despite Waddy's possible impeachment of her testimony. Therefore, Waddy's fifteenth proposition fails.

In his fourteenth and sixteenth propositions of law, Waddy contends that these convictions are against the manifest weight of the evidence. Since we do not review appeals on that basis, see, e.g., Cooey, supra, 46 Ohio St.3d at 26, 544 N.E.2d at 905–906, we must overrule these propositions of law.

## III

### Prosecutorial Misconduct

#### A

#### Brady Issues

In his ninth proposition of law, Waddy contends that the prosecution illegally withheld evidence favorable to him and material to guilt or punishment, in violation of Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and Crim.R. 16(B)(1)(f).

Prosecution witness Karen Martin testified that, on the morning of July 18, she saw a medium- to dark-skinned black male driving Mason's car. Martin did not identify Waddy, but she specifically testified that Greg Jefferson (who she saw leaving the courtroom just before she testified) was not the driver.

On cross-examination, Martin testified that, when she reported the incident, detectives showed her a photographic array, but she could not pick out the driver. After Martin stepped down, the defense moved for a mistrial, arguing that her failure to pick Waddy out of the array (assuming his picture was in it) was evidence favorable to the defense which the state should have disclosed before trial. The trial court denied a mistrial and a motion to strike Martin's

testimony, but ordered the prosecution to reconstruct the array for defense counsel to examine.

The next day, Sergeants Nash and Sears, Columbus homicide detectives, testified outside the jury's presence that they had never shown Martin a photo array. The defense renewed its motion to strike Martin's testimony, which was again denied.

Waddy argues that, if Martin did see a photo array, the defense had a right to examine it. If Waddy's photo was in the array, he argues, Martin's inability to identify him was favorable evidence, and the array should have been presented to the jury. But Sears and Nash testified that they did not show Martin an array—thus supporting the trial court's finding that there was no *Brady* violation. Since the record supports this finding, we cannot say it was wrong; resolving such factual disputes are within the sound discretion of the trial court.

Waddy argues that, if the trial court believed that Martin did not see an array, it should have stricken her testimony regarding the photo identification as irrelevant under Evid.R. 104(B). This argument is academic, since Martin's testimony regarding the array—that she did not see the driver of Mason's car in it—clearly could not have harmed Waddy.

Waddy also complains that the jury was not allowed to hear Nash and Sears testify that they showed no photo array to Martin. We disagree. Although the detectives testified outside the jury's presence in the motion hearing, the state later called both men to testify before the jury. Waddy asked about the photo array on cross-examination. See Staff Note to Evid.R. 611(B) (cross-examination not limited to scope of direct).

Even if Martin saw a photo array with Waddy's photo in it, we cannot conclude that the array was "material either to guilt or to punishment." *Brady, supra*, 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494.

We think the array, if it existed at all, fails *Bagley*'s materiality test. Martin did not eliminate Waddy as the driver of Mason's car; she merely failed to identify him. This does little to refute the inference that Waddy was the driver. Indeed, some courts hold that a witness's failure to identify the defendant is not exculpatory evidence at all. See *McMullin v. State* (Ala. Crim.App.1983), 442 So.2d 155, 158; *Johnson v. United States* (D.C.App.1988), 544 A.2d 270, 275; but, see, *Evans v. Janing* (C.A. 8, 1973), 489 F.2d 470, 476,

quoting *United States v. Ash* (1973), 413 U.S. 300, 318–319, 93 S.Ct. 2568, 2578, 37 L.Ed.2d 619, 632; *State v. Reddick* (1985), 197 Conn. 115, 120–121, 496 A.2d 466, 470. We need not go so far; Martin's failure to pick Waddy out of an array might be "favorable" evidence, but it would clearly not be so favorable that the state's failure to disclose it could undermine confidence in the result, given the evidence of Waddy's guilt. Waddy's ninth proposition is without merit.

## B

### Separation of Witnesses

In his tenth proposition of law, Waddy contends that Detective Sears spoke to Allen Russell before Russell testified, and thus violated the trial court's order for separation of witnesses. On cross-examination, Russell testified that Sears had discussed the case with him the previous day when Russell was in the prosecutor's office for fifteen to twenty minutes with Assistant Prosecutor David Johnson.

Russell quoted Sears as saying: "I want the same thing said that was said in the very beginning of this case." Testifying outside the jury's presence, Sears characterized the discussion differently. Sears testified that he told Russell "that he explained some facts back in July and August of 1986, and I expected him to explain those same facts to Mr. Johnson [assistant prosecutor]." Sears and Russell both testified that Sears told Russell to tell the truth. Johnson also told Russell "over and over and over" to tell the truth. Russell described Sears's manner as "aggressive" and "assertive." Sears admitted he raised his voice during the conversation.

Apparently Sears did not technically violate the separation order: so far as the record shows, he was not in the courtroom when Russell testified. However, Waddy claims that Sears's out-of-court contact with another witness violated the purpose of the order.

The purpose of a separation order is "so that [witnesses] cannot hear the testimony of other witnesses," Evid.R. 615, and tailor their own testimony accordingly. Thus, a spectator or witness may not tell a prospective witness what has taken place in court if the judge has ordered separation of witnesses. *State v. Spirko* (1991), 59 Ohio St.3d 1, 14, 570 N.E.2d 229, 246. However, at the time of their conversation, neither Sears nor Russell had yet testified. There is no evidence that Sears disclosed any witness's testimony to Russell, nor does Waddy so claim. Thus, Sears violated neither the letter nor the spirit of the separation order.

Waddy also charges that Sears sought to influence Russell's testimony with "intimidation" and "threats." However, both Sears and Johnson repeatedly insisted that Russell tell the truth, as Russell conceded. Yet Russell did not explain how Sears wanted him to testify (except that Sears wanted him to stay consistent with earlier statements, which are not in the record). We find no merit in Waddy's tenth proposition.

## C

### Testimony by Prosecutor's Staff

State's Exhibits PM–24 and PM–25 are Columbus Dispatch articles about Mason's murder, introduced to show that the public did not know Mason was strangled. This was relevant because Waddy told Milligan that Mason was strangled; the state claimed Waddy could not have learned that from the newspapers. Carmelina Conti of the Franklin County Prosecutor's Office identified PM–24 and PM–25 as the only articles about the murder she found in two public libraries.

Waddy's twelfth proposition of law asserts that the articles were hearsay. However, they were not introduced for the truth of any matter asserted therein. See Evid.R. 801(C).

Waddy further suggests the state violated the Code of Professional Responsibility by having a member of the prosecutor's staff testify. However, he cites no Disciplinary Rule forbidding an attorney to call an employee to testify. None exists. Under DR 5–101(B) and 5–102, a lawyer generally may not represent a client if "he or a *lawyer* in his firm ought to be called as a witness * * *." (Emphasis added.) But the record does not show Conti was a lawyer. Moreover, cross-examination could expose any bias on Conti's part. This proposition therefore lacks merit.

## D

### Closing Argument

In his seventeenth proposition of law, Waddy complains of eight alleged instances of prosecutorial misconduct in the guilt phase of the trial. Waddy objected to four, preserving them for review.

When Waddy's counsel argued to the jury that Greg Jefferson or Allen Russell might be the killer, the prosecutor rebutted by arguing that this was "a standard defense."

Waddy's contention that this statement was improper has some merit. The prosecutor suggested that such defenses are common and implied that they are usually bogus. His argument invited the jury to substitute the prosecu-

tor's experience for its own evaluation. Cf. *State v. Greer* (1988), 39 Ohio St.3d 236, 252, 530 N.E.2d 382, 401. However, a prosecutor's conduct is generally not reversible error unless it robs the defendant of a fair trial. *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402, 473 N.E.2d 768, 793. We do not think the prosecutor's comment did so here. It was not repeated, and the prosecution's argument concentrated on the evidence. "Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion[,] not of evidence, do not reach" the level of a due process violation. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 646, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 438.

The prosecutor also described some testimony inaccurately. He said: "Allen Russell testified that Warren Waddy tried to get him to use the Bank One [Visa] card with Paula Mason's name on it." The trial court overruled an objection, but instructed: "The jury can draw upon their own memories as to what the testimony was."

The prosecutor's statement, while an inaccurate summary of Russell's testimony, was a reasonable inference from that testimony. Russell testified that Waddy offered him a chance to "make some money on a particular card." Although Russell never specifically said this was Mason's card, he did indicate that it was the same card Waddy later gave to Greg Jefferson, which the state proved was indeed Mason's.

The prosecutor also said that Jefferson had no access to Waddy's home at the time of the murder, and thus could not have worn the red gloves found in Waddy's closet. According to the prosecutor, Jefferson did not visit 801 Oak Street until after Russell moved there, five days after the murder. Again, the defense objected and the court instructed the jurors to "draw upon your own memories." The state concedes this statement was incorrect.

Of course, a prosecutor may not deliberately misstate evidence or argue facts not in the record. But reversal is not the remedy for every trivial factual error in a prosecutor's argument. *Dunlop v. United States* (1897), 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799, 803. The errors were corrected by the trial court's instruction to the jurors to rely on their own memories. The prosecutor's mistakes did not render the trial fundamentally unfair, and thus "cannot be made a ground of error * * *." *Maurer, supra.*

Waddy also complains that the prosecutor argued that "all of these crimes" were not "separate and distinct," and that the evidence "reveal[ed] a pattern." The prosecutor also said that he "did not spend the last two weeks trying four separate cases," but "trying one man who committed four separate cases." This was not misconduct. The prosecution was entitled to use "other acts" to show the accused's identity. Evid.R. 404(B). Considered in that light, the

cases were not "separate and distinct." As the prosecutor himself said, he was not asking the jury "to take all of the counts collectively and decide whether or not the defendant is guilty of all collectively. That can't be so."

Other alleged errors were not objected to. They are reversible only if they amounted to plain error—that is, if Waddy would clearly have been acquitted but for the alleged error. See, *e.g., State v. Williford* (1990), 49 Ohio St.3d 247, 252, 551 N.E.2d 1279, 1284. We find no plain error, and therefore hold that Waddy's claims are waived. We overrule his seventeenth proposition of law.

## IV

### Jury Misconduct

In his nineteenth proposition of law, Waddy argues that the trial court should have granted his new trial motion. Waddy's motion was based on two alleged incidents involving the jury.

At the motion hearing, an employee of Waddy's attorney testified that Mason's mother had cried in front of five or six jurors while waiting for an elevator after penalty-phase closing argument. But Mason's mother and another witness contradicted this testimony. The trial judge specifically found that, although Mason's mother boarded an elevator at the same time as a juror, she did not cry at any time in the juror's presence. The testimony supports these findings.

Waddy further accuses the jury of misconduct because four jurors allegedly played cards during deliberations. In the mitigation phase, the trial court delivered instructions orally. The jury was apparently told that typed copies of the instructions would be supplied as well. The jury retired to deliberate. It took a long time to type and copy the instructions; the jury twice signaled the court to ask when the instructions would be ready. The bailiff responded both times. The second time, the bailiff saw four jurors playing cards. Once the written instructions were delivered, the jury was out two or three hours before reaching a verdict.

These facts do not amount to juror misconduct. There is no evidence that any jurors played cards during deliberations. Rather, the testimony and findings support an inference that the card game took place while the jurors had suspended deliberations to wait for written instructions. Waiting for the written instructions indicates conscientiousness, not carelessness. Because the record does not support Waddy's misconduct assertions, his nineteenth proposition is overruled.

## V

### Suppression Issues

### A

#### "Suggestive" Voice Identification

On August 5, 1986, police had Wilson listen to a taped conversation between Waddy and Milligan. She identified Waddy's voice as that of "D.C.," who had raped her. On August 19, police played the same conversation for Jackson. She identified Waddy's voice as that of the man who burglarized her home and robbed her. The prosecution also played the conversation to both women in court during trial; again they identified Waddy's voice.

In his third proposition of law, Waddy claims that police used unduly suggestive procedures to get Wilson and Jackson to identify Waddy's voice. Accordingly, he claims, the identifications were unreliable and should have been suppressed.

When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances. *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401; *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140.[3]

Under *Neil*'s two-pronged test, the first question is whether the identification procedure was unnecessarily suggestive. Wilson and Jackson, both of whom were attacked by a black male, heard only two voices, one recognizably that of a black male (Waddy), the other that of a white male (Milligan). That is certainly a suggestive procedure. Moreover, in Jackson's case "there was no emergency or exigent circumstance," *Manson, supra*, 432 U.S. at 109, 97 S.Ct. at 2250, 53 L.Ed.2d at 151, requiring use of the tape. Waddy had been arrested nearly two weeks before. He plausibly argues that police could have asked Jackson to pick her assailant from a "voice lineup" of exemplars by

---

**3.** Citing *United States v. Albergo* (C.A. 2, 1976), 539 F.2d 860, the state suggests that this rule does not apply to voice, as opposed to visual, identifications. However, we recently applied *Neil*'s due process standard to a voice identification. *State v. Parker* (1990), 53 Ohio St.3d 82, 87–88, 558 N.E.2d 1164, 1169–1170. *Neil* itself involved a voice identification as well as a visual one, see *id.*, 409 U.S. at 195, 93 S.Ct. at 380, 34 L.Ed.2d at 409, and did not suggest that a different standard applied to the former. Moreover, the Second Circuit seems to have backed away from *Albergo*. See *United States v. Moore* (C.A. 2, 1978), 571 F.2d 76, 91, and *Brown v. Harris* (C.A. 2, 1981), 666 F.2d 782, 786–787.

similar-sounding speakers.[4]   Thus, the procedure used was unnecessarily suggestive.

Wilson's case is different, however, because Waddy was not in custody on August 5.   Had police asked him for an exemplar, they would have tipped him off to the rape investigation, allowing him to destroy evidence (police did not search Waddy's house until August 6) or intimidate Wilson (the rapist knew where she lived).   Thus, police had to use the Waddy–Milligan tapes with Wilson.   Cf. *Chambers v. State* (Ind.1981), 422 N.E.2d 1198, 1201–1202. Theoretically, perhaps, at great cost in time and effort, police might have created several exemplars identical to the Waddy–Milligan conversation for a lineup.   But the Constitution does not require police to jump through such hoops.   Thus, we do not find the procedure used with Wilson *unnecessarily* suggestive.

Since the identification procedure used with Jackson was unnecessarily suggestive, we must apply the second part of the *Neil* test.   The question is whether, under all the circumstances, the identification was reliable, *i.e.,* whether suggestive procedures created "a very substantial likelihood of irreparable misidentification."   *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253, quoted in *Neil,* 409 U.S. at 198, 93 S.Ct. at 381, 34 L.Ed.2d at 410.   Key factors are the witness's opportunity to view (in the case of a voice identification, to hear) the defendant during the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the witness's certainty, and the time elapsed between the crime and the identification.   *Neil,* 409 U.S. at 199–200, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

Jackson had an excellent opportunity to hear the burglar's voice.   He was in her home for half an hour and spoke several times.   She thoroughly described the burglar's manner of speaking and remembered what he said, indicating a high attention level.   After Jackson identified the voice, a detective told her to "make sure that was the same voice that I heard the night that I was attacked"; she did not waver in her identification.   Like the victim in *Neil,* 409 U.S. at 200, 93 S.Ct. at 382, 34 L.Ed.2d at 412, Jackson "was no casual observer," but the victim of a protracted invasion of her home coupled with a physical assault.

---

4. Other courts have recognized the desirability of voice lineups. See *State v. Johnson* (1983), 207 Mont. 214, 222, 674 P.2d 1077, 1081; *Harris v. State* (1978), 268 Ind. 12, 17, 373 N.E.2d 149, 152 (concurring opinion). See, also, *White v. State* (Alaska App.1989), 773 P.2d 211, 214. We emphasize that we are not *requiring* voice lineups;   we simply note that they are less suggestive than the method used here.

Two negative factors exist. Jackson's fear could have distorted her auditory perception. See *Thigpen v. Cory* (C.A. 6, 1986), 804 F.2d 893, 897; 1 LaFave & Israel, Criminal Procedure (1984) 551, Section 7.1(b). Also, nearly two months elapsed between crime and identification; however, in *Neil* factors favoring reliability outweighed a seven-month gap. On balance, we find no "very substantial" likelihood of misidentification. *Neil*, 409 U.S. at 198, 93 S.Ct. at 381, 34 L.Ed.2d at 410. Jackson's identification of the burglar's voice on the tapes was therefore admissible. (Wilson's identification is even more reliable, since she knew Waddy. See *State v. Parker* [1990], 53 Ohio St.3d 82, 87, 558 N.E.2d 1164, 1169.) Waddy's third proposition is overruled.

## B

### Fifth Amendment Issue

In his fourth proposition of law, Waddy claims that his statements to police should have been suppressed because the state failed to show that he voluntarily waived his Fifth Amendment rights. Finding Waddy's claim utterly unsupported by the record, we overrule it.

The sole witness at the suppression hearing was Officer Neal Mason, who kept an eye on Waddy while police searched Waddy's house. Officer Mason testified that a detective read Waddy his rights and Waddy refused to make a statement. Despite this, Waddy spontaneously made several statements to Mason over the next ninety minutes to two hours. Additional statements were made by Waddy on the trip to the police station in the presence of Officer Mason. No officer asked Waddy questions, nor did anyone comment about the evidence in Waddy's presence.

The Fifth Amendment does not bar volunteered statements. *Miranda v. Arizona* (1966) 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726. Officer Mason's uncontroverted testimony shows that Waddy's statements were volunteered, not elicited. Waddy does not deny this; he simply argues that we should not believe Officer Mason. This proposition of law is overruled.

## C

### Validity of Search

In his twenty-eighth proposition of law, Waddy asserts that the trial court erred by denying his motion to suppress evidence found at 801 Oak Street during execution of a search warrant. According to Waddy, the warrant was invalid and police seized more than it authorized.

## Validity of Warrant

Waddy challenges the warrant's validity by alleging that one misrepresentation and several omissions tainted the affidavit. To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either "intentionally, or with reckless disregard for the truth." *Franks v. Delaware* (1978), 438 U.S. 154, 155–156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667, 672. "Reckless disregard" means that the affiant had serious doubts of an allegation's truth. *United States v. Williams* (C.A. 7, 1984), 737 F.2d 594, 602. Omissions count as false statements if "designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate." (Emphasis deleted.) *United States v. Colkley* (C.A. 4, 1990), 899 F.2d 297, 301.

Even if the affidavit contains false statements made intentionally or recklessly, a warrant based on the affidavit is still valid unless, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause * * *." *Franks, supra,* 438 U.S. at 156, 98 S.Ct. at 2676, 57 L.Ed.2d at 672.

The affidavit, signed by Detectives Sears and Martin, stated that Waddy had been convicted of various crimes including burglary. Waddy points out that he was never convicted of burglary; however, he introduced no evidence that the affiants knew this or seriously doubted the allegation's truth. Rather, Detective Sears testified that he mistook a burglary arrest noted on Waddy's rap sheet for a conviction. This was negligent, but negligence is insufficient to traverse the affidavit. *Franks, supra,* 438 U.S. at 171, 98 S.Ct. at 2684, 57 L.Ed.2d at 682.

The affidavit stated, based on the affiant's "years of experience as a criminal investigator," that burglars conceal stolen property at their homes. Waddy attacks this statement as misleading. The Milligan burglary was twelve days old when the affidavit was sworn; Waddy claims burglars generally do not keep stolen goods in their homes that long. However, the affidavit gave the date of the Milligan burglary; the judge could therefore evaluate for himself the likelihood that the goods were still at Waddy's residence.

Waddy also argues that the affidavit was signed by both Sears and Martin, and it is unclear which one knew that burglars generally keep stolen goods at home. But probable cause may be based on the knowledge of more than one

officer. *Benner, supra,* 40 Ohio St.3d at 308, 533 N.E.2d at 710. Thus, it is irrelevant which officer had a particular bit of information.

The affidavit said Waddy, a felon, listed Kay Drake as his sponsor and 801 Oak as his address on his registration. Waddy argues that the affidavit should have mentioned other facts tending to show that Waddy no longer lived there. This reasoning is flawed. The record shows that Waddy did in fact live at 801 Oak at the time the affidavit was sworn; therefore, the alleged omissions could not mislead the judge and are not material. Moreover, even had the omitted information been included, the affidavit would have stated probable cause to order a search of 801 Oak. According to the affidavit, a call to Milligan had been traced to a phone at that address registered to Waddy's sponsor, Kay Drake.

We find no material omissions, no evidence of perjury, no reckless disregard of the truth. We must therefore conclude that the warrant was valid.

2

Scope of Search

Waddy also argues that items not named in the warrant but seized in its execution should have been suppressed. He specifically challenges the seizure of three items: the red Arizona Glory gloves, the homemade ski mask, and the roll of chart tape. The state argues that these were properly seized under the plain view doctrine.

Under this doctrine, an officer may seize an item without a warrant if the initial intrusion leading to the item's discovery was lawful and it was "immediately apparent" that the item was incriminating. *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583.[5] Since police were executing a valid warrant, the intrusion was lawful. Waddy contends, however, that the incriminating nature of the items seized was not immediately apparent.

"The 'immediately apparent' requirement * * * is satisfied when police have probable cause to associate an object with criminal activity." *State v. Halczyszak* (1986), 25 Ohio St.3d 301, 25 OBR 360, 496 N.E.2d 925, paragraph three of the syllabus. Sears had probable cause to connect the tape and gloves with Mason's murder. The tape had red fuzz adhering to it, as Sears knew the tape found at the murder scene did. The fuzz was similar in color to the gloves. Sears knew that Waddy had boasted to Milligan of strangling a young woman at Jefferson and Broad. The gloves were hidden inside a paper

---

5. The discovery need not be inadvertent. *Horton v. California* (1990), 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112.

bag with a Halloween mask and the ski mask. The gloves' proximity to the masks gave Sears additional reason to believe that the gloves were burglar's tools. As for the ski mask, the circumstances of its discovery support Sears's conclusion that it too was a burglar's tool.

In any case, the mask was the least significant item of the state's evidence. Only one blue fiber was introduced and connected with the mask. Compared to the more numerous red fibers, the fingerprint on the jewelry box, and Waddy's admission to Milligan, the mask played so small a part in the case against Waddy that we can confidently say its admission was nonprejudicial beyond a reasonable doubt.

Waddy argues that, however incriminating the items may have been in the Mason murder, police could not seize them because they had no probable cause at that time to connect them to the Wilson and Milligan crimes on which the warrant was based. Waddy's argument lacks merit. Although the police were investigating the Wilson and Milligan crimes when they executed the warrant, they could seize evidence of other crimes under the plain view doctrine. See LaFave, *supra*, at 237–238, Section 3.4(k). Therefore, we overrule this proposition of law.

### D

### Failure to State Factual Findings

In his fifth proposition of law, Waddy complains that the trial court erred by refusing to "state its essential findings" of fact, Crim.R. 12(E), on defense motions to suppress evidence. See *Bryan v. Knapp* (1986), 21 Ohio St.3d 64, 21 OBR 363, 488 N.E.2d 142. However, we think the record sufficient to allow full review of the suppression issues. See *State v. Brewer* (1990), 48 Ohio St.3d 50, 60, 549 N.E.2d 491, 501. We reject this proposition of law.

### VI

### Inflammatory Evidence

### A

### Evidence of Victim's Character

In his sixth proposition of law, Waddy asserts that the guilt-phase testimony of Mason's boyfriend, Travis Lyon, was an irrelevant, prejudicial appeal to the jury's emotions, tainting the conviction and sentence.

Lyon testified he met Mason in Somerset, Ohio, "about a year and a half or two years" before her death. He testified that Mason moved to Columbus about six months before her death, but they continued to see each other.

Lyon also testified that, at 7:00 a.m., July 18, 1986 he tried to telephone Mason, but got no answer. A coworker of Lyon then testified that between midnight and 12:15 a.m., July 18th, Mason called Lyon at his workplace, but Lyon could not come to the phone.

Waddy claims that Lyon's testimony was irrelevant. We disagree; it narrowed down the time of Mason's death. As for the personal details about Mason's history, they established a foundation for Lyon's testimony. Lyon's relationship to Mason explains why they called each other, which corroborates his testimony.

Ron Edgington, a college classmate, ex-boyfriend, and coworker of Mason's, also testified. Waddy complains that Edgington testified about such matters as Mason's hometown, employment history, and apartment in Columbus, how she walked to work, and how she was furthering her education. But Edgington also testified that Mason had a plastic box in her apartment similar to State's Ex. PM–17A, which had Waddy's fingerprint on it, that she owned a jump rope (she was strangled with a jump rope), and that her kitchen window had a "flimsy screen" with "cracks and gaps in it." Edgington further testified that, when Mason failed to show up for work on July 18, he "got concerned" and went to her apartment. After work, Edgington returned; this time he noticed that her blinds were shut, even though Mason hardly ever shut them. He went back a third time and found Mason's body.

Edgington's testimony about Mason, like Lyon's, corroborated and laid a foundation for his later testimony. His relationship with Mason explained his going to her apartment on July 18 and his familiarity with her apartment, possessions, and habits. We find the testimony of Lyon and Edgington relevant and therefore reject Waddy's sixth proposition of law.

B

Gruesome Photos

In his seventh proposition of law, Waddy complains that gruesome photographs of Paula Mason's corpse prejudiced him. Such photographs are admissible, however, if their probative value outweighs the danger of material prejudice to the defendant and they are not repetitive or cumulative. *State v. Maurer, supra*, paragraph seven of the syllabus.

Eleven photographs showed parts of Mason's corpse. Only three are even arguably gruesome: Ex. PM–1BB, PM–1CC, and PM–1DD, which show Mason's battered face. However, only one focuses on the face.

Ex. PM–1BB shows Mason's body lying on its back after being turned over. It shows the body's lividity (discoloration from blood settling to the lowest

part of the body), which the deputy coroner used to estimate time of death. Ex. PM–1CC shows how the rope around Mason's neck was knotted and indicates how tight it was. Ex. PM–1DD is a full-face shot of Mason, showing her bruised lips, black eye, and blood on her face. These injuries corroborate the deputy coroner's conclusion that Mason was beaten before being strangled.

These photographs are neither repetitive nor cumulative (indeed, the state showed unusual restraint). Their probative value is high, and their potential for prejudice relatively low, since only one focuses on Mason's facial injuries. We conclude that they were properly admitted. Waddy's seventh proposition is overruled.

## C

### Tape Recordings

In his eighth proposition of law, Waddy contends that the trial court should have prevented the repeated playing of taped conversations between Milligan and Waddy.

The tapes were played during the testimony of Wilson, Jackson, Milligan and Jefferson. Waddy does not contest admissibility, but claims the repetition was prejudicial. However, a trial court need not exclude evidence simply because it is cumulative. See Staff Note to Evid.R. 403. We agree with the court of appeals that "[e]ach playing of the tape had probative value * * * distinct from the others * * *." Thus, the first part of this proposition lacks merit.

Waddy also attacks the use of transcripts to help the jurors follow the tapes. He claims this violated Evid.R. 1002, the "best evidence" rule. However, the transcripts were not admitted into evidence, so Evid.R. 1002 is irrelevant. See Jacobs, Ohio Evidence: Objections and Responses (1989) 287–289, Section 1002–2(D).

Moreover, Waddy conceded the transcripts's accuracy at trial. We have compared the tapes and transcripts ourselves and find the latter accurate. Where there are no "material differences" between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error. *State v. Holmes* (1987), 36 Ohio App.3d 44, 50, 521 N.E.2d 479, 486. Accord *United States v. Smith* (C.A. 6, 1976), 537 F.2d 862, 863–864.

Waddy urges us to reject *Holmes* and find prejudice based on "overemphasis or the incorrect implication caused by trying to establish something with both an original and an additional 'aid.'" Waddy cites no authority for his

proposed rule. More important, he does not explain how an accurate transcript could create any "incorrect implication." We reject his argument, and his eighth proposition of law.

## D

### "Offense of Violence" Specification

Each count of the first indictment (the Wilson, Jackson, and Milligan crimes) contained a sentence-enhancing specification that Waddy had previously been convicted of an "offense of violence." See R.C. 2929.11(D). Under R.C. 2941.143, a defendant in a jury trial "may request that the trial judge * * * determine the existence of the specification * * *." The trial judge offered Waddy a choice between having the specifications determined by the judge or jury. Waddy chose the jury. In his eleventh proposition of law, Waddy argues that he should have been allowed to have a three-judge panel determine the specifications because the noncapital crimes were joined with a capital crime.

Waddy's position is both meritless and frivolous. R.C. 2941.143 offers a defendant only two options: he may have the specification determined by the jury or "the trial judge." No provision for a three-judge panel exists. Waddy cites R.C. 2929.022, but R.C. 2929.022 simply offers the same options as R.C. 2941.143: a capital defendant in a jury trial may have the existence of relevant prior convictions tried to the jury or "the trial judge." A capital defendant may be tried by a three-judge panel only if he waives a jury. R.C. 2945.06; R.C. 2929.022(A). No statute allows him to try some issues to a jury and others to a panel. Waddy's eleventh proposition is overruled.

## VII

### Instructions on Principal Offender

In his twenty-second proposition of law, Waddy argues that the prosecutor's guilt-phase closing argument and the trial court's penalty-phase instructions erroneously implied that being a principal offender is an aggravating circumstance.

Being a principal offender is an element of the felony-murder aggravating circumstance defined by R.C. 2929.04(A)(7). Obviously a trial court may so instruct. *State v. Holloway* (1988), 38 Ohio St.3d 239, 243–244, 527 N.E.2d 831, 836. The court must not indicate that being a principal offender is, by itself, an additional aggravating circumstance. *Id.* at 244, 527 N.E.2d at 836, fn. 2. However, no reasonable juror could have so understood the trial court's

instruction or the prosecutor's argument.[6]  Waddy's contrary contention is baseless.

## VIII

### Merger

In his eighteenth proposition of law, Waddy reminds us that, where a defendant who kills only one victim is convicted of two aggravated murder counts, the trial court may sentence on only one count.  R.C. 2941.25(A); *State v. Huertas* (1990), 51 Ohio St.3d 22, 28, 553 N.E.2d 1058, 1066.  Relying on R.C. 2941.25(A), Waddy argues that the prosecution must elect, *before* the penalty phase, which count shall be submitted to the jury for sentencing. Since the trial judge merged the two aggravated murder convictions before handing down the sentence, we reject this argument.  See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568, 572.

Waddy further argues that the jury, in considering two counts of aggravated murder, each containing the same two aggravating specifications, may have collectively and improperly weighed four specifications against him. This argument is speculative.  The trial court's instructions clearly told the jury to consider two specifications as to Count One and two specifications as to Count Two.  We must presume the jury did so.  *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237, 1246.  Moreover, the state's closing argument in the penalty phase referred consistently to two aggravating circumstances, not four.  Thus, as in *Poindexter, supra*, the record contains no basis for Waddy's speculation that the jury may have double-counted aggravating circumstances.

In his twenty-third proposition of law, Waddy argues that the felony-murder specifications based on aggravated burglary should have been merged with the felony-murder (kidnapping) specifications based on kidnapping, leaving one specification instead of two on each aggravated murder count.

---

6.  The trial judge instructed the jury that each count of aggravated murder had *two* aggravating circumstances.  He then explained what those aggravating circumstances were, as follows:

"*Number one*, that the aggravated murder was committed while Warren Waddy was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary, *and* the defendant personally committed each act which constituted the aggravated murder, including the strangling that caused the death of Paula Mason.

"*Number two*, that the aggravated murder was committed while Warren Waddy was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, *and* the defendant personally committed each act which constituted the aggravated murder, including the strangling that caused the death of Paula Mason.  * * * *"
(Emphasis added.)

If aggravated burglary and kidnapping are allied offenses of similar import, merger was required. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus, and *id.* at 197, 15 OBR at 339, 473 N.E.2d at 295, fn. 27. "Allied offenses of similar import are those offenses whose elements correspond to such a degree that the commission of one offense will result in the commission of the other." *State v. Mitchell* (1983), 6 Ohio St.3d 416, 418, 6 OBR 463, 464, 453 N.E.2d 593, 594. If a defendant is convicted of allied offenses of similar import, the court must examine his conduct to determine "whether the offenses were committed separately or with a separate animus as to each." *Id.*

Waddy was convicted of two R.C. 2929.04(A)(7) aggravating circumstances: aggravated burglary and kidnapping. Burglary consists of trespassing in an occupied structure by force, stealth, or deception with purpose to commit a theft offense or felony. If, *inter alia,* the burglar inflicts physical harm on another, or the structure is a habitation in which any person was present, the offense is aggravated burglary. R.C. 2911.11(A)(1) and (3).

Obviously aggravated burglary is not implicit within kidnapping. Also, kidnapping is not implicit within aggravated burglary. Unlike robbery or rape, burglary does not inherently require the victim's restraint. Cf. *Jenkins, supra,* 15 Ohio St.3d at 198, 15 OBR at 340, 473 N.E.2d at 295, fn. 29; *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345. Nor does inflicting physical harm, as required for aggravated burglary under R.C. 2911.11(A)(1), necessarily require the victim's restraint; even if it did, Waddy imposed further restraint on Mason by tying her up. Thus, aggravated burglary under either R.C. 2911.11(A)(1) or (3) is not an allied offense of similar import to kidnapping. The trial court correctly refused merger. This proposition is overruled.

## IX

### Sentencing Errors

Waddy's twenty-fourth proposition of law attacks the trial court's sentencing opinion on various grounds.

First, Waddy argues that the trial court misunderstood the verdict. The trial court stated that Waddy had been convicted of "Specifications One and Two" as to each count, when in fact he was convicted of Specifications Three and Four. But on the first page of his opinion, the trial judge correctly set forth the *elements* of the specifications Waddy was convicted of. Cf. *State v. Wiles* (1991), 59 Ohio St.3d 71, 90, 571 N.E.2d 97, 120. The judge understood the verdict; his error was inconsequential.

Second, Waddy complains that the trial judge misapplied R.C. 2929.04(B)(3). This provision creates a mitigating factor if "the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." The trial judge said: "This is for all intents and purposes an insanity defense. No such defense was made." As Waddy points out, R.C. 2929.-04(B)(3), which requires a lack of "substantial capacity," is not the same as the insanity defense, which exculpates a defendant who completely lacks capacity. *State v. Van Hook* (1988), 39 Ohio St.3d 256, 263, 530 N.E.2d 883, 890; *State v. Lawrence* (1989), 44 Ohio St.3d 24, 29, 541 N.E.2d 451, 457.

But the trial court specifically found "that the defendant does not suffer from a mental disease [or] defect." A disease or defect is a necessary element of R.C. 2929.04(B)(3). *Van Hook, supra.* Thus, even applying the correct standard, the trial judge could not have found this mitigating factor. In these circumstances, the error is plainly harmless.

Third, Waddy argues that the trial judge weighed each mitigating factor individually instead of collectively against the aggravating circumstances. Waddy cites the sentencing opinion's statement that insanity "was not shown by evidence outweighing the aggravating circumstances * * *." Waddy misinterprets this passage, in which the court determined which individual mitigating factors *existed*. When one examines the part of the opinion where the court weighed aggravation against mitigation, it becomes clear that mitigating factors were weighed collectively and not individually against aggravating circumstances. The opinion says: "Comparing the aggravating circumstances to the claimed mitigating factors the Court finds * * * that the aggravating circumstances are sufficient to outweigh any claimed mitigation * * *." The trial judge did not err.

Fourth, Waddy complains that the judge did not specify Waddy's criminal record to support the judge's apparent conclusion that Waddy had "a significant history of prior criminal convictions and delinquency adjudications." R.C. 2929.04(B)(5). But Waddy did not attempt to prove this factor—probably wisely, given his prior conviction of carrying a concealed weapon and the convictions mentioned in the search warrant affidavit. Thus, he failed to carry his burden of proving that this factor existed. See *Jenkins, supra,* 15 Ohio St.3d at 171–172, 15 OBR at 317–318, 473 N.E.2d at 275.[7]

---

7. Waddy presented no evidence of his criminal record, did not ask for a presentence investigation, and did not argue this factor to the judge or jury. We note that the trial judge specifically disavowed any affirmative reliance on Waddy's criminal record "in determining whether the sentence of death should be imposed."

Finally, Waddy claims that the trial court did not consider the testimony of his witnesses. But the trial court noted that Waddy's brother and Kay Drake testified, giving "a brief history of his life as a child and his life with * * * Drake." Thus, the judge considered this evidence; Waddy's real complaint is simply that the judge was not impressed. That complaint is a fit subject for our independent review, but is not a valid ground of error.

The trial judge committed no prejudicial error. Had he done so, our independent reweighing would correct it. *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304. This proposition is overruled.

In his thirtieth proposition of law, Waddy contends that the court of appeals failed to articulate the reasons why the aggravating circumstances outweighed the mitigating factors, as R.C. 2929.05 requires. See *Maurer, supra,* paragraph four of the syllabus. However, the court did give its reasons. Waddy had adduced childhood spankings as a mitigating factor; the court pointed out that Waddy and his siblings "were punished *only* if they had misbehaved. * * *" And it noted that "many grow up in as bad or even far worse conditions without turning to criminal conduct."

The court observed that Waddy's "list of goals," adduced in mitigation, "expresses no remorse even though * * * purportedly written a mere four days after" the murder. The court further noted that the list "is centered around defendant's desires with little or no concern for anyone else * * *."

In discussing a 1969 psychiatric evaluation of Waddy, the court said: "Even at that time, defendant had little or no conscience and was found to be difficult to rehabilitate." The court found a 1969 "social history report" worth little because it contained "minimal information on defendant."

The court of appeals adequately explained why aggravating circumstances outweighed mitigating factors. Moreover, had the court of appeals erred, our independent review would cure that error. *Lott, supra; State v. Clark* (1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844, 855–856.

In his twenty-ninth and thirtieth propositions of law, Waddy also argues that the court of appeals should have included in its proportionality review cases in which life sentences were imposed. This contention lacks merit. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

## X

### Settled Issues

In his twenty-ninth proposition of law, Waddy presents numerous boilerplate arguments against the Ohio death penalty statutes. All have been

rejected many times. See, generally, *Jenkins, supra,* 15 Ohio St.3d at 167–179, 15 OBR at 314–324, 473 N.E.2d at 272–281. See, also, *Walton v. Arizona* (1990), 497 U.S. 639, ——, 110 S.Ct. 3047, 3055–3056, 111 L.Ed.2d 511, 525–527 (plurality opinion); *Blystone v. Pennsylvania* (1990), 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255; *Steffen, supra,* 31 Ohio St.3d at 124–125, 31 OBR at 284–285, 509 N.E.2d at 395–396; *Henderson, supra,* 39 Ohio St.3d at 28–29, 528 N.E.2d at 1242–1243; *State v. Buell* (1986) 22 Ohio St.3d 124, 135–141, 22 OBR 203, 213–218, 489 N.E.2d 795, 806–810. They are summarily overruled, as are Waddy's twentieth,[8] twenty-first,[9] twenty-fifth,[10] twenty-sixth,[11] and twenty-seventh [12] propositions of law.

## XI

### Independent Review

We now independently consider whether aggravating circumstances outweigh mitigating factors beyond a reasonable doubt and whether the death sentence is disproportionate to sentences in similar cases. R.C. 2929.05(A).

Waddy was convicted of two aggravating circumstances. The jury found that Waddy, as a principal offender, committed the murder while committing, attempting, or fleeing immediately after committing or attempting to commit (1) aggravated burglary, and (2) kidnapping. He presented three mitigating factors: his troubled childhood, his redeeming qualities, and his low I.Q.

Waddy grew up in a family of nine children. Both parents and both maternal grandparents lived in the home. Waddy's father drove a truck, spending much of his time on the road. Waddy's brother Aubry testified that, when their father got home, "he would get the reports" on the children's behavior and spank those who had misbehaved with a strap or extension cord. According to a "social history" of Waddy (compiled in 1969 in connection with a juvenile charge), his mother also spanked him for teasing his siblings.

---

8. See, *e.g., State v. Williams* (1986), 23 Ohio St.3d 16, 21–22, 23 OBR 13, 18–19, 490 N.E.2d 906, 912.

9. *State v. Roe* (1989), 41 Ohio St.3d 18, 25, 535 N.E.2d 1351, 1360–1361.

10. See *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137.

11. See, *e.g., State v. Esparza* (1988), 39 Ohio St.3d 8, 13–14, 529 N.E.2d 192, 198. Accord *Brown v. Dixon* (C.A. 4, 1989), 891 F.2d 490, 496–498, overruling *Brown v. Rice* (W.D.N.C. 1988), 693 F.Supp. 381.

12. See, *e.g., Esparza, supra,* 39 Ohio St.3d at 13, 529 N.E.2d at 197–198.

Waddy's parents had below-average intelligence. The social worker who compiled the 1969 social history described the family as "lower class, culturally-deprived" and "matriarchal." Waddy's father seemed to have no interest in the family "other than providing their basic material needs." A 1969 psychiatric evaluation quotes Waddy calling his father a "cold lover."

Waddy claims that his childhood home was "unstructured" and "relatively abusive." Spanking is not necessarily child abuse. The evidence shows that the children were spanked only when bad and does not show excessive force.

Moreover, Waddy's brother, raised in the same environment, is a law-abiding citizen. Aubry Waddy, at the time of trial, was an Army sergeant with a highly responsible position in the 101st Division. He finished high school, entered college, and was studying for an associate degree. Thus, Waddy's childhood environment does little to explain his crime and has virtually no mitigating value.

Kay Drake lived with Waddy for nine years and is the mother of Waddy's daughter Natalie. She testified that Natalie is very fond of Waddy. Waddy has treated Natalie well, taken her places, played with her, and baby-sat her while Drake worked. Waddy did not expose Drake or Natalie to his drug use.

Drake testified that Waddy was beaten up badly in the fall of 1985. After the beating, Waddy stayed home and developed an interest in real estate. He began reading real estate books and self-motivation books. On July 22, 1986 (four days after the murder), Waddy wrote a list of goals entitled "My Personal Commitment to Myself" in which he pledged to have a net worth of $250,000 within the next two years, which he stated would allow him to retire. Waddy also tried to better himself by attending welding school and business college.

Drake's testimony about Waddy's good qualities is entitled to some weight. On her showing, Waddy was an attentive and loving father who at least made some effort to reform himself. While her testimony may have been biased, it was also uncontradicted.

On the other hand, we give Waddy's "Personal Commitment" little weight. It does indicate Waddy's desire to rehabilitate himself, make an honest living, stop committing crimes and taking drugs, and help his family and community. But his "goals" are so grandiose and unrealistic as to cast doubt on Waddy's rehabilitative prospects. For instance, Waddy vows to buy "at least" four houses and accumulate $40,000 equity in each one. He expects to have $250,000 in two years and "generate a yearly cash flow" of $125,000 from that sum.

The 1969 psychiatric evaluation diagnosed borderline mental retardation associated with environmental deprivation. Waddy's I.Q. dropped about ten points after he left school in 1966; in 1969, it was measured at 72. The evaluation also states that Waddy "has a poorly developed conscience" and "presents a real problem for rehabilitation." Waddy's low I.Q. has some mitigating weight. However, the relevance of the psychiatric evaluation is limited because it deals with Waddy's 1969 condition, not his 1986 condition. We agree with the courts below that Waddy failed to prove a "mental disease or defect."

Waddy tied Paula Mason up and murdered her while burglarizing her home. He bears sole responsibility for this crime. Few mitigating factors exist. We find that the aggravating circumstances outweigh them beyond a reasonable doubt. The death sentence is therefore appropriate.

We also find it proportionate, for we have upheld several death sentences involving murder during aggravated burglaries and kidnappings. See *Wiles, supra,* 59 Ohio St.3d at 95, 571 N.E.2d at 124–125, and cases cited therein, for cases of burglary-murder; and see, *e.g., State v. Roe* (1989), 41 Ohio St.3d 18, 535 N.E.2d 1351; *Brewer, supra; State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, for cases of kidnap-murder.

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.