OPINION
On February 23, 2000, a Franklin County grand jury issued a multiple-count indictment against James Coleman, Troy Thoman, Barry Thoman, Marvin Napier, and Robert Craven. The facts, as are relevant to this appeal, reveal that the criminal charges resulted from searches for alleged fugitives Timothy Cox and Dwight Williams, who had reportedly "skipped out" on bonds posted by Columbus Bail Bonds. Mr. Coleman, at all pertinent times, was employed by Columbus Bail Bonds, variously referred to in this record as a "bail enforcement officer/agent" or, as it is more commonly known, a "bounty hunter."
Counts one, two and three of the indictment charged four of the five codefendants (excluding Craven) with abduction, a felony of the third degree. In addition, the abduction counts carried firearm specifications.
Count one alleged that four of the codefendants (again, excluding Craven) abducted Amy Cox, Timothy Cox's sister, on November 11, 1998.
All other counts of the indictment arose from an incident at a later date. Count two alleged that the same four codefendants abducted Ladasha Denny, Dwight Williams's girlfriend, on March 16, 1999; count three stemmed from the same incident and named as its victim five-month-old Dwight Williams, the son of Ladasha Denny and Dwight Williams.
Count four of the indictment arose from the same March 16, 1999 incident, alleging that all five codefendants kidnapped Ms. Denny, "with purpose to terrorize, or to inflict serious physical harm" on her. The kidnapping count also carried firearm specifications.
Finally, count five, again arising out of the March 16, 1999 incident, accused Coleman, Craven, and Troy Thoman of extortion, alleging that they violated the menacing and/or aggravated menacing statutes (R.C. 2903.22
and 2903.21, respectively), "with purpose to obtain any valuable thing or valuable benefit, to wit: money for a bail contract."
The trial court granted a motion to sever Mr. Coleman's case from his co-defendants' cases for trial.
In August 2000, the trial court granted a prosecution motion to consolidate the case with a burglary charge already pending against Mr. Coleman. The burglary charge arose from the same November 11, 1998 alleged abduction of Amy Cox, the victim named in count one of the latter indictment.
On August 25, 2000, counsel for Mr. Coleman filed a motion seeking separate trials on count one and the remaining four counts. In particular, he sought severance of count one, the alleged abduction in November 1998, from the remaining counts which all stemmed from the later incident. As addressed fully in our discussion of the third assignment of error, defense counsel argued that Mr. Coleman would be unfairly prejudiced being tried for charges arising from two wholly unrelated events. The prosecution filed a memorandum contra in response.
Following arguments of counsel immediately preceding trial, the court denied the motion for severance of the counts.
James Coleman's jury trial commenced on April 10, 2001.
After the parties closed their respective cases, defense counsel moved for a Crim.R. 29 dismissal of counts four and five, the kidnapping and extortion charges. The trial court granted the motion.
The jury ultimately found Mr. Coleman guilty only of count two, the abduction of Ladasha Denny in March 1999, without the firearm specification. The jury found him not guilty as to counts one and three, the remaining abduction charges.
A sentencing hearing was conducted on May 31, 2001. Pursuant to an entry journalized June 1, 2001, Mr. Coleman was sentenced to a four-year term of community control, fined $1,500, and ordered to pay court costs. The trial court also journalized its dismissal of counts four and five.
James Coleman (hereinafter "appellant") has timely appealed, assigning three errors for our consideration[1]:
Assignment of Error #2:
 The court sub judice committed prejudicial error when it denied appellant's request for special instructions based upon the common law privilege of bailbondsmen to enter into the residence of a fugitive to apprehend the fugitive as elucidated in the Supreme Court of the United States case Taylor v. Taintor.
Assignment of Error #3:
 The trial court abused its discretion when it denied appellant's motion to sever count one relating to the alleged abduction of Amy Cox from counts two, three, four and five relating to crimes allegedly committed against Ladasha Denny and Dwight Williams.
Assignment of Error #4:
 Appellant's conviction of one count of abduction pursuant to R.C. 2905.02 of Ladasha Denny was against the manifest weight of the evidence.
Since resolution of the fourth assignment of error requires a thorough review and recitation of the evidence adduced at trial, we address it first. Because appellant was convicted only of the lone count of abduction, we limit our discussion to the facts underlying that charge.
Preliminarily, we set forth the standard by which we are bound in reviewing this assignment of error, which asserts that appellant's abduction conviction was against the manifest weight of the evidence.
In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court of Ohio reiterated the well-established standard of review for manifest weight claims:
 * * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's * * * [Law Dictionary (6 Ed. 1990) 1433] * * * at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs * * * [v. Florida], 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Accordingly, pursuant to the foregoing standard, we examine the record to determine whether the jury "clearly lost its way" in convicting appellant such that a manifest miscarriage of justice occurred. Appellant contends that the jury did indeed lose its way in convicting appellant of abducting Ladasha Denny.
In satisfying its evidentiary burden, the prosecution was required to prove the elements of "abduction," which are set forth in R.C. 2905.02(A):
 No person, without privilege to do so, shall knowingly do any of the following:
 (1) By force of threat, remove another from the place where the other person is found;
 (2) By force or threat, restrain the liberty of another person, under circumstances which create a risk of physical harm to the victim, or place the other person in fear * * *.
We turn now to the evidence presented at trial to ascertain whether appellant's conviction was against the manifest weight of the evidence. As indicated infra, we limit our discussion to the facts pertaining to appellant's conviction for the abduction of Ladasha Denny.
Ronald Jennings testified regarding his recollection of the March 1999 incident involving Ladasha Denny. At that time, Mr. Jennings was employed by the owner of Ms. Denny's apartment complex, the Nelson Park Apartments, as a maintenance worker. According to Mr. Jennings, on March 16, 1999, he was summoned to the office by the manager because some men wanted to be let into Ladasha Denny's apartment. One man was white; appellant, the other man, was black. The white man identified himself as a federal marshal who was "looking for somebody." Since Jennings had never heard of such a request in his twenty years of experience, he told the manager he would do so "under protest." At the time of trial, Mr. Jennings could not recall the exact address they wanted to enter. (Tr. 238-240.)
When Mr. Jennings and the "marshal" went to the apartment, appellant "went around to the rear of the place." Neither of these men showed Jennings any documentation, such as a warrant, and Jennings questioned the legality of what they were doing. When Jennings took the men to the apartment, Jennings wanted to announce "maintenance," but the "marshal" told him not to. When Jennings turned the key on the door, the "marshal" kicked the door open and "went in like SWAT." "[H]e kicked it and pulled out a gun, and told everybody to get down." They discovered that no one was in the apartment at the time. (Tr. 240-242.)
The same men showed up the next day, asking Mr. Jennings "to do the same thing." Since Jennings was busy at the time, the manager let them in. Mr. Jennings was working on an apartment in a building next door. He saw Ladasha Denny nearby, who was "upset and crying" because "her kid was over there, and these guys had her at her neighbor's house." (Tr. 242-244.)
According to Mr. Jennings, he observed these men for approximately fifteen to twenty minutes, during which they were "questioning her" and "restraining her by attaching little straps to her, and took her out to a black Jeep Cherokee." Jennings described the restraint as a "white strap or string" which they "pulled * * * tight." After they put her in the vehicle, they drove off, saying they were taking her to jail. (Tr. 244-246.)
On cross-examination, Mr. Jennings indicated that he provided an oral statement to a Detective Covey over the telephone. Jennings acknowledged that he never told the detective that Ladasha Denny had been "handcuffed"; according to Mr. Jennings, the reason he never told the detective is because he never asked. When Mr. Jennings was asked by defense counsel how far away he was from Ms. Denny and the others as they grabbed her and took her away, he clarified that it was only "five doorways." (Tr. 246-256.)
Mr. Jennings also clarified on cross-examination that, although he could not recall if he saw which man or both put the "handcuffs" on Ms. Denny, both men "escorted her" to the Jeep. (Tr. 261.) As they led her away, both men repeatedly told Ms. Denny that she was under arrest and was going to jail. (Tr. 264.)
On redirect examination, after having his memory refreshed with a statement written by Detective Covey, Mr. Jennings explained that he told the detective about the men using "restraints" on Ms. Denny; he did not recall using the word "handcuffs." (Tr. 276.)
Ladasha Denny testified that, on the date of the incident, she was living at the Nelson Park Apartments, located in Columbus at 2006 Maryland Avenue, Apt. B. At that time, she lived there with her two children and her boyfriend, Dwight Williams. According to Ms. Denny, she was watching television with her friend Aja Mitchell, her son Dwight Williams, and her boyfriend of the same name. Then, "something scary" happened. (Tr. 280-281.)
When there was a knock at her door, Ms. Denny looked out the peephole and saw appellant. She looked out again, but she did not see anyone there that time. She opened the door and her boyfriend, Dwight Williams, walked out the door. According to Ms. Denny, that is when she saw appellant "and another guy walking back with Ron Jennings, the maintenance man." (Tr. 281-282.)
Ms. Denny provided the following account of ensuing events:
 They [the two men with Jennings] walked away from the door and walked along the sidewalk right into the rental office. When they walked into the rental office, * * * I closed my door back. I didn't know who they were. Me and Aja sat back on the couch with my son.
 No sooner when I sat my son on my lap, my door got opened by Ron Jennings * * *. And when he opened the door, one guy ran straight up the stairs to my upstairs, which was * * * [appellant]. His partner stayed downstairs with us. And [appellant] was upstairs approximately * * * three minutes or so.
 He came back downstairs yelling and screaming at me: ["]Where is Dwight? Where is Dwight?["]
I said: ["]He is not here. Who are you?["]
 At this point in time he still didn't identify himself * * *. Then after he asked me like maybe after four times where was Dwight, he took his gun from * * * under his shirt. * * *
 I had an entertainment stand. He set [the gun] directly on my entertainment stand. And he turned it towards my son and asked me where was Dwight. [Tr. 282-283.]
Ms. Denny described the gun appellant placed on her entertainment stand as being a gold-colored "semiautomatic." By this point, according to Ms. Denny, she had told appellant that she did not know where Dwight Williams was. Neither man was wearing a badge and neither identified himself to her. (Tr. 285-286.)
When Ms. Denny repeatedly insisted that Mr. Williams was not there, appellant responded by essentially accusing her of lying because she was his girlfriend and the mother of his child. Appellant then threatened Denny by saying that he would "tell my landlord I had an illegal occupant living with me that is not on my lease." (Tr. 286.)
Ms. Denny testified that the two men continued to remain in her apartment without her permission even after they determined that Dwight Williams was not there. (Tr. 287.)
After appellant "and his partner had a little conversation," appellant told Ms. Denny that she "had 15 minutes to find Dwight; otherwise, [she] was going to jail." Ms. Denny left to look for Dwight around the apartment complex. When she returned and told the men she could not find Dwight, appellant finally identified himself. "* * * [H]e said he was a bounty hunter from Columbus Bail Bonds. He was arresting me for helping to hide Dwight. * * * At that time I was handcuffed." According to Ms. Denny, before she was handcuffed, she explained that she was seven months' pregnant and asked if she had to be handcuffed behind her back; appellant said, "yes because [she was] riding in his personal vehicle." (Tr. 288-290.)
Ms. Denny described the handcuffs as "white plastic," or "flexcuffs." At some point during this dispute, appellant took her infant son and handed him to someone. Ms. Denny's mother eventually found the baby at approximately 1:00 a.m. (Tr. 291.)
Ms. Denny described what happened next:
 * * * [Appellant's] partner went to the parking lot and pulled the truck around * * *.
 They pulled the truck kind of like on the sidewalk and kind of in the street. That is when they both grabbed one of my arms and took me in the truck and placed me in the back of the truck.
* * *
 I was highly nervous because I didn't have a clue what was going on. I was crying, for one, because I got handcuffed. After the point of getting handcuffed, I was told the real reason why I was getting arrested, and it wasn't for hiding Dwight.
* * *
 * * * I told them could I call my dad, because I wasn't leaving without my dad.
 He told me, no, I was under arrest for running a red light and driving with no ops. That is like a warrant I got when I was 16 years old. [Tr. 291-292.]
Ms. Denny reiterated that it was appellant who told her she was under arrest based upon this alleged warrant. Both men "escorted" her, still handcuffed behind her back, to their waiting vehicle. They placed her in the back of the vehicle, and did not tell her where they were taking her.
Ms. Denny testified that they first took her to a gas station, where the men went in and bought Pepsi and cigarettes while she remained cuffed in the backseat. According to Ms. Denny, the following ensued:
 * * * When they came back to the truck, they got on the phone. [Appellant] said he was calling his boss, which turns out to be Troy [Thoman]. Troy arrived a half an hour after the phone call at the gas station because we were sitting there.
* * *
Two other individuals [arrived]. * * *
 * * * Marvin Napier, he got in the truck and he told me that he didn't want to really take me to jail. He understood my condition that I was pregnant and scared. He said I shouldn't be helping to hide my boyfriend. He said he knew that I knew there was a few spots where I could find Dwight. He said: ["]Can you take me to where he hangs out?["] I said sure. [Tr. 296.]
The men, including appellant, then took Ms. Denny to numerous places searching for Dwight. They told her that she "would be let go" if they found him, so she provided information as to where he might be found. She remained handcuffed the entire time. Eventually, the group found Dwight. They handcuffed him and placed him in the backseat of the truck beside Ms. Denny. (Tr. 297-300.)
Even after the bounty hunters had secured Dwight, Ms. Denny remained involuntarily under their control. She testified that they told her that she was "getting taken to jail anyway, because [she] had a warrant, an outstanding warrant, as he said, which was a juvenile [traffic] warrant." However, she was not taken to jail; they took her to Columbus Bail Bonds. She did not know why they took her there and she was "not given a choice." Eventually, appellant told her that she could "pay the bond" to avoid being taken to jail. She was told the bond was $80, and the only money she had was the $70 the men had taken from Dwight's pockets before taking him to jail. They finally allowed her to call her father to bring the $10 more she needed to post bond. Her father went to Columbus Bail Bonds with the money she needed. Ms. Denny testified that she remained "flexcuffed" during this entire ordeal. She was finally freed at approximately 9:30 that evening. (Tr. 301-305.)
The prosecution introduced into evidence the receipt of the bond posted by Ms. Denny that evening.
Aja Mitchell testified that she was at Ladasha Denny's apartment during the incident as described by Ms. Denny. Significantly, Ms. Mitchell recalled appellant's use of handcuffs on Ms. Denny.
Appellant testified on his own behalf. He admitted going to Ms. Denny's apartment with another "bail agent." Appellant was armed with an operable .45 caliber semiautomatic handgun which was "silver" in color. (Tr. 632, 664, 753-754.)
According to appellant, he knocked on the door and no one answered. He and the other bail agent went to the rental office, showed the manager the warrant for Dwight Williams, and the manager contacted Mr. Jennings, the maintenance man. According to appellant, he called someone from his cell phone and was informed that Dwight Williams was in that apartment. (Tr. 664-665.)
Mr. Jennings let appellant and the other bail agent into Ms. Denny's apartment. Appellant testified that he entered with his weapon drawn and announced himself. When Ms. Denny came out of the kitchen, appellant claimed to have reholstered his weapon. Although appellant claimed that Aja Mitchell was not in the apartment, his later statement to police indicates that a teenaged girl had been in the apartment. (Tr. 666-667; 758.)
Appellant testified that Ms. Denny agreed to help him find her boyfriend after he (appellant) told her that Dwight could simply repost bail once they found him. According to appellant, Ms. Denny voluntarily accompanied him in search of Dwight. According to appellant, Ms. Denny was never handcuffed. (Tr. 667-669.)
Appellant acknowledged that he was aware of a traffic warrant for Ms. Denny's arrest; however, he again denied handcuffing her, threatening to arrest her, or actually "arresting" her. He claimed that he was not interested in the traffic warrants, although he did call the police to inform them. Apparently, according to appellant, the police indicated they were not interested in following up on a traffic warrant. (Tr. 736-737.)
Appellant testified that he knew that he did not have the authority to arrest Ladasha Denny on the traffic warrant or for any other reason. Ms. Denny was not out on any bond to appellant or anyone else prior to this incident. Appellant testified that Ms. Denny voluntarily accompanied him to Columbus Bail Bonds that night to post a bond in her traffic case.
Marsha Dozier testified in the rebuttal portion of the state's case. Ms. Dozier, who lived in an apartment near Ms. Denny's, had signed Dwight Williams's bond documents to enable him to get out of jail. As such, appellant came to see her in the search for appellant on the date of this incident. Ms. Dozier told appellant that she thought Mr. Williams was at Ms. Denny's apartment. When the bondsmen could not find Dwight Williams at Ms. Denny's, they returned to Ms. Dozier's apartment and told her that she would be held responsible for Dwight.
Ms. Dozier witnessed the treatment of Ms. Denny at the hands of appellant. He placed plastic handcuffs on Ms. Denny behind Ms. Denny's back. Ms. Denny was crying and obviously upset. When Ms. Dozier asked whether they really had to take Ms. Denny, they responded that they would, "because she wouldn't tell them where Dwight was." (Tr. 780-783.)
Based on our review of the evidence, we cannot say that appellant's conviction was against the manifest weight of the evidence.
Appellant emphasizes "serious discrepancies" among some prosecution witnesses regarding the facts. Although a manifest weight claim allows us to consider witness credibility to a limited extent, we nonetheless may not simply substitute our judgment for that of the factfinder. Only if the jury "clearly lost its way" in resolving conflicts in the evidence may we depart from the customary deference accorded the factfinder.
The jury clearly believed that appellant abducted Ms. Denny, within the statutory definition set forth infra, and the evidence supports such a determination.
Given the state of this record, we believe that the jury acted well within its province in believing the testimony of some witnesses and rejecting all or part of others, and no "manifest miscarriage of justice" resulted such that a new trial should be ordered. To reiterate the heavy burden an appellant bears in this respect, an appellate court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Thompkins, supra, at 387. Given the evidence as detailed above, this is not such a case.
Appellant's fourth assignment of error is overruled.
Turning now to appellant's third assignment of error, he contends that the trial court abused its discretion in denying appellant's motion to sever count one from the four other counts. As indicated above, defense counsel filed a pretrial motion seeking severance of the charges because the incident, which occurred on November 1998, involving Amy Cox and the March 1999 incident involving Ladasha Denny were "not related either to fact or time." The charges involved separate events occurring some four months apart, and, moreover, separate victims and prosecution witnesses.
To reiterate, appellant was not convicted of any charges related to the alleged incident involving Amy Cox in November 1998. In relevant part, Ms. Cox's testimony involved allegations similar in nature to those surrounding the abduction of Ms. Denny. In particular, Ms. Cox offered evidence of appellant's pattern of using excessive force against third-parties, non-bailees, in his attempts to capture fugitive bailees.
Appellant relies upon Crim.R. 14, which reads, in pertinent part, as follows:
 If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * for trial together * * *, the court shall order an election or separate trial of counts * * *. [Emphasis added.]
As noted by the prosecution, Crim.R. 14 must be considered in pari materia with Crim.R. 8(A), which provides:
 Two or more offenses may be charged in the same indictment * * * in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.
In denying the motion, the trial court cited the "law that is contained in the state's memorandum in support of its memorandum contra" and concluded that "there is sufficient similarity between the two incidents that would make it appropriate to try all of the counts together in one trial." (Tr. 11.)
The Supreme Court of Ohio analyzed Crim.R. 8 and 14 in State v. Lott (1990), 51 Ohio St.3d 160, in which the court stated:
 The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged "are of the same or similar character." State v. Torres (1981), 66 Ohio St.2d 340 * * *. While joinder is a viable trial procedure, an accused may move to sever under Crim.R. 14 upon a showing of prejudice. For an appellate court to reverse a trial court ruling denying severance, the defendant must demonstrate that the trial court abused its discretion.
 "A defendant * * * under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." State v. Torres, supra, at syllabus. [Id. at 163.]
In following and applying Lott, the Supreme Court of Ohio has repeatedly upheld joinder of cases for trial, reiterating the rigid standard a defendant must satisfy in "affirmatively showing that his rights were prejudiced," as required by Crim.R. 14. See, e.g., State v. Waddy (1992), 63 Ohio St.3d 424. Thus, our inquiry here is limited to ascertaining whether appellant can demonstrate an abuse of discretion by the trial court.
Based upon the record before us, we cannot say that the trial court abused its discretion in denying defense counsel's motion to sever count one from the remaining charges. Given the circumstances of this case in toto, we agree with the prosecution's position that the jury demonstrated its ability to examine the evidence and appropriately segregate the various charges. Appellant has not demonstrated the requisite prejudice necessary to find an abuse of discretion on the severance issue.
The third assignment of error is overruled.
In his second and final assignment of error, appellant argues that the trial court erred in denying appellant's request for an instruction to the jury based upon the "common law privilege of bailbondsmen to enter into the residence of a fugitive to apprehend the fugitive," pursuant to Taylor v. Taintor (1872), 83 U.S. 366.
The record reveals that the trial court summarily declined to extend the principles elucidated in the 1872 case of Taylor to the circumstances of this case. We agree. Taylor does not provide a bondsman/bounty hunter to forcibly restrain and/or detain third-parties, non-bailees, in the process of attempting to apprehend a fugitive.
Appellant's second assignment of error is overruled.
As noted above, the original first assignment of error has been withdrawn. Having overruled the remaining assignments of error, the judgment of the trial court is affirmed.
Judgment affirmed.
PETREE and BRYANT, JJ., concur.
[1] Appellant has withdrawn a claimed error initially designated as "Assignment of Error #1." However, we maintain his originally-assigned numbers to prevent any confusion.