[Cite as *State v. Thomas*, 2017-Ohio-4356.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 1-16-36

    v.

MARVIN L. THOMAS,                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2015 0417

Judgment Affirmed

Date of Decision:   June 19, 2017

APPEARANCES:

    *Dustin M. Blake* for Appellant

    *Jana E. Emerick* for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, Marvin L. Thomas ("Thomas"), appeals the June 13, 2016 judgment entry of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from a drug investigation that began as early as September of 2014, when Thomas was seen engaging in what authorities suspected was drug activity. Several tips caused authorities to further focus their attention on Thomas and, between the early months of 2015 and October of the same year, authorities kept Thomas under extensive surveillance. This included monitoring his residence via video, as well as conducting numerous searches of trash that Thomas had set by his curb for collection. A GPS tracking device was placed on Thomas's vehicle. Through these various methods of surveillance, authorities recovered multiple samples of narcotics, as well as paraphernalia commonly used by those trafficking in narcotics. Authorities also observed multiple instances of drug transactions and contacts between Thomas and drug traffickers, both at Thomas's home and elsewhere. After many months of investigation, authorities arrested Thomas on October 15, 2015.

{¶3} On October 23, 2015, the Allen County Grand Jury indicted Thomas on Count One of possession of heroin in violation of R.C. 2925.11(A), (C)(6)(f), a felony of the first degree, Count Two of trafficking in heroin in violation of R.C.

2925.03(A)(2), (C)(6)(g), a felony of the first degree, Count Three of illegal manufacture of drugs in violation of R.C. 2925.04(A), (C)(2), (E), a felony of the second degree, Count Four of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), (B)(1), and 2929.14(B)(3), a felony of the first degree, and Count Five of having weapons while under disability in violation of R.C. 2923.13(A)(3),(B), a felony of the third degree. (Doc. No. 1). Count One includes a specification under R.C. 2941.1410(A) alleging that Thomas is a major drug offender ("MDO") as defined in R.C. 2929.01 in that Count One involved the possession of, sale of, or the offer to sell heroin in an amount of at least two hundred fifty grams. (*Id.*). Count One also includes an automobile forfeiture specification under R.C. 2941.1417(A) alleging that Thomas was the owner or possessor of a 2008 GMC vehicle that was contraband or property derived from the offense or was used or intended for use to transport or store drugs. (*Id.*). Count One also includes that specification as related to a black 2011 Cadillac. (*Id.*). Counts Two and Three include the same MDO and forfeiture specifications that are in Count One. (*Id.*). Count Four includes forfeiture specifications as to both vehicles mentioned above. (*Id.*). Count Five includes a firearms specification under R.C. 2941.141(A) and 2929.14(B)(1)(e) alleging that Thomas knowingly acquired, had, carried, or used a firearm or dangerous ordinance after having been convicted of a felony involving

the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse. (*Id.*).

{¶4} Thomas appeared for arraignment on November 2, 2015 and pled not guilty to all counts and specifications in the indictment. (Doc. No. 10). That same day, Thomas filed a motion to dismiss Count Four of the indictment, claiming that Count Four was defective because it did not specify the enterprise with which Thomas was connected for purposes of the statute and because it did not specify prior incidents of corrupt activity necessary to establish a pattern of such activity. (Doc. No. 8). The State filed a response to that motion on November 17, 2015. (Doc. No. 29). Thomas filed a reply to the State's response on November 25, 2015. (Doc. No. 34). That same day, the trial court denied Thomas's motion to dismiss Count Four of the indictment. (Doc. No. 35).[1] The State filed a bill of particulars specifying the predicate offenses for Count Four on December 2, 2015. (Doc. No. 38).

{¶5} A total of five motions to suppress evidence followed. (Doc. Nos. 23, 24, 25, 30, 33). Thomas's assignments of error relate only to his second, third, and fourth motions to suppress. (Appellant's Brief at 13, 19, 24). In Thomas's second motion to suppress, he sought the suppression of evidence gathered after a stop and subsequent search of Thomas's vehicle on October 15, 2015. (Doc. No. 24).

---

[1] On December 30, 2015, the trial court overruled a motion to reconsider the denial of Thomas's initial motion to dismiss Count Four. (Doc. No. 49).

Thomas argued that the State was without both reasonable suspicion and probable cause to stop and search him and his vehicle. (*Id.*). Specifically, he argued that the sniff by the canine was a search within the meaning of the Fourth Amendment and that, because a canine can detect some legal substances, an alert by the canine did not give rise to a reasonable belief of criminal activity. (*Id.*).

**{¶6}** In Thomas's third motion to suppress, he asked that the trial court exclude evidence gathered by the use of a camera installed on a utility pole outside his residence which then recorded the exterior of his home and the area surrounding it for a number of months. (Doc. No. 25). Specifically, Thomas argues that the use of a camera to surveil him constantly for an extended period is not analogous to an observation by a passing neighbor and that it is, therefore, a search within the meaning of the Fourth Amendment. (*Id.*).

**{¶7}** In Thomas's fourth motion to suppress, he asked that the trial court exclude evidence stemming from the installation of a GPS tracking device on his 2011 Cadillac. (Doc. No. 30). Specifically, Thomas argued that alleged drug transactions did not involve the 2011 Cadillac but instead involved a different vehicle. (*Id.*).

**{¶8}** The State filed responses to all of those motions to suppress. (Doc. Nos. 36, 37, 39, 50, 63).

{¶9} On February 23, 2016, the trial court overruled the third and fifth motions to suppress. (Doc. No. 90). The trial court held a hearing on the fourth motion to suppress on February 29, 2016, and it denied that motion on the same day. (Doc. No. 95). On March 7, 2016, the trial court held a hearing on Thomas's second motion to suppress, and overruled the motion on March 15, 2016. (Doc. No. 113).

{¶10} On April 28, 2016, Thomas pled no contest to Count One with the MDO specification and the forfeiture specification pertaining to the Cadillac, no contest to Count Four with the forfeiture specification pertaining to the Cadillac, and no contest to Count Five. (April 28, 2016 Tr. at 37-38); (Doc. No. 129). Counts Two and Three were dismissed. (Doc. No. 130).

{¶11} The trial court accepted Thomas's no contest pleas and found him guilty of those offenses and specifications to which he pled no contest. (*Id.*). On June 13, 2016, the trial court sentenced Thomas to 11 years in prison as to Count One, 10 years in prison as to Count Four, and 2 years in prison as to Count Five, with all prison terms to be served consecutively for a total of 23 years of incarceration. (Doc. No. 138). The trial court further suspended Thomas's driver's license for 6 months and ordered that Thomas's interest in his 2011 Cadillac be forfeited. (*Id.*).

{¶12} Thomas filed his notice of appeal on July 12, 2016. (Doc. No. 141). He brings six assignments of error for our review. For ease of discussion, we will

address his third, fourth, fifth, and sixth assignments of error separately, and then his first and second assignments of error together.

**Assignment of Error No. III**

**The Trial Court Erred In Overruling Thomas'[s] Motion To Suppress IV (GPS) And Its Fruits Obtained From Said Evidence, The Warrant Having Been Obtained Without Probable Cause, Which Resulted In Unreasonable Searches And Seizures.**

{¶13} In his third assignment of error, Thomas argues that the trial court erred in denying his fourth motion to suppress evidence because the warrant authorizing the placement of a GPS device on Thomas's vehicle was not supported by probable cause. (Appellant's Brief at 13). Specifically, Thomas avers that the search warrant was not supported by probable cause because the information provided in the affidavit supporting the warrant was stale and thus did not support the belief that cocaine or evidence of cocaine trafficking would still be in Thomas's vehicle. (*Id.* at 15). Thomas further argues that some of the evidence included in the affidavit in support of the search warrant was obtained illegally and that the use of illegally obtained evidence taints the search warrant irreparably. (*Id.* at 14). Thomas further asserts that the trial court erred in denying the motion to suppress evidence because the affidavit in support of the search warrant did not have sufficient facts to give rise to a finding of probable cause. (*Id.* at 17).

{¶14} We begin by noting that, though Thomas argues that the trial court's rulings violate the constitutions of Ohio and of the United States, the Ohio

Constitution's search-and-seizure provisions have been interpreted as providing the same protection as is provided by the Fourth Amendment to the United States Constitution. *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-239 (1997).

**{¶15}** A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

**{¶16}** When reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant, our duty is simply to "ensure that the magistrate had a substantial basis for concluding that probable cause existed." *State v. George*, 45 Ohio St.3d 325 (1989), paragraph two of the syllabus, citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317 (1983). We must not conduct "a de novo

determination as to whether the affidavit contains sufficient probable cause upon which the court would issue the search warrant," but rather accord great deference to the trial court's determination of probable cause and resolve marginal cases in favor of upholding the warrant. *George* at paragraph two of the syllabus. We recognize that the duty of the issuing official is simply to make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 329, citing *Gates* at 238-239.

{¶17} The exclusionary rule should not bar the use of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate even if that warrant is ultimately found to be unsupported by probable cause. *Id.* at 325, citing *U.S. v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984). Exclusion remains proper, however, where the magistrate or judge who issued the warrant was misled by information in the affidavit that the affiant knew was false or would have known was false if not for reckless disregard of the truth, where the magistrate wholly abandoned his judicial function in issuing the warrant, where the affidavit is "so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable," or where the warrant is so

facially deficient that officers cannot reasonably presume its validity. *George* at 331, citing *Leon* at 923.

{¶18} Thomas argues that the trial court erred in denying his motion to suppress evidence in part because the information was stale such that it did not provide probable cause of drug activity at the time the warrant was issued. (Appellant's Brief at 14-15). Our review of the record indicates that Thomas never raised the issue of staleness in his fourth motion to suppress. (*See* Doc. No. 30). Our review further indicates that he never raised the issue of staleness at the hearing on that motion. (*See* Feb. 29, 2016 Tr.).[2] Because that issue was not raised before the trial court, we conclude that Thomas has waived it on appeal. *State v. Shindler*, 70 Ohio St.3d 54, 58 (1994) (noting that, by requiring the defendant to state with particularity the legal and factual issues before the trial court, the prosecutor and the trial court are informed of those issues to be heard and decided and, "*by omission, those issues which are otherwise being waived*") (emphasis added).

{¶19} Thomas also argues that the judge who issued the search warrant "relied on information that was illegally and unconstitutionally obtained, which

---

[2] The transcript of the hearing on Thomas's fourth motion to suppress mentions a supplement to his motion. (Feb. 29, 2016 Tr. at 10). The record contains a supplement that discusses illegally obtained evidence, which Thomas discusses in his third assignment of error. (Appellant's Brief at 14). However, the page numbering of that supplement and the motion to which it is attached suggest that this supplement is actually part of Thomas's second motion to suppress, filed November 12, 2015, rather than his fourth motion to suppress, filed November 20, 2015. The certificate of service attached to the supplement also indicates that it was part of the second motion to suppress, and it includes a service date of November 12, 2015. This is perplexing because our reading of the record indicates that the material relevant to the fourth motion to suppress includes a supplement apparently filed before the motion.

cannot be excised." (Appellant's Brief at 14). For this proposition, Thomas cites *State v. Waddy*. 63 Ohio St.3d 424 (1992). *Waddy* concerns a misrepresentation and various omissions that tainted an affidavit, not information that was illegally obtained. *Id.* at 441. For that reason, we conclude that *Waddy* is inapplicable here.

{¶20} Thomas also relies substantially on our decision in *State v. Foster*. *State v. Foster*, 3d Dist. Allen No. 1-14-54, 2015-Ohio-3401, ¶ 11. In that case, we noted that evidence gathered during the execution of a search warrant is not admissible if the warrant was issued in reliance upon evidence obtained from an illegal search. *Foster* at ¶ 11. However, *Foster* involved a situation in which the police who conducted the search knew that they needed a warrant but decided to proceed without one. *Id.* at ¶ 10. We have subsequently explained that the exclusion of evidence is proper where police demonstrate "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, not when police conduct themselves with an objectively reasonable, good-faith belief that their conduct is lawful. *State v. Bolen*, 3d Dist. Seneca No. 13-16-01, 2016-Ohio-7821, ¶ 40, citing *Davis v. United States*, 564 U.S. 229, 131 S.Ct. 2419, 2427 (2011). As in *Bolen*, we find no evidence in this record that the police who conducted the search at issue did so with any deliberate, reckless, or grossly negligent disregard for Thomas's rights. Therefore, we conclude that Thomas's argument that the trial court should have

suppressed evidence because the judge who issued the warrant did so relying upon illegally obtained information is without merit. *Id.*

{¶21} We will now address whether the affidavit provides probable cause to issue the search warrant Thomas challenges. The affidavit at issue here consists of seven pages of text comprised of seventeen numbered paragraphs. (State's Ex. 1). In the affidavit, the affiant provided the following information: the affiant has been employed by the Lima Police Department since May 19, 2008 and is assigned to the Lima Allen County Interdiction Task Force, having been involved in many narcotics investigations and had extensive training as to drugs and drug interdiction. The affiant also has extensive experience interviewing defendants and witnesses as part of his duties and is thus well-versed in the drug trade. On September 23, 2014, Lima's drug task force was conducting surveillance of room 225 of a Motel 6 at 1800 Harding Highway. During the course of monitoring Jaime Hernandez, the occupant of room 225, officers observed Thomas operating a 2011 black Cadillac registered to his daughter Ashley Williams. Thomas stopped at Hernandez's motel room and picked him up in that vehicle, and the two men traveled to J's American Pub for approximately one hour. During that hour, Thomas exited the business alone and was seen talking on two cellular phones simultaneously. He did the same thing after he and Hernandez traveled to Texas Roadhouse in Lima. Based on his training and experience, the affiant knows it is common for drug dealers to use

multiple cellular phones to assist them in their illegal activities. The two men eventually returned to the motel where Thomas dropped Hernandez off and then departed. A later check of Thomas's criminal history revealed that he had multiple drug-related arrests and convictions, including both possession of and trafficking in cocaine. A subsequent search of Hernandez's motel room revealed $20,000 in cash concealed in a light fixture. The affiant's training and experience lead him to believe that Hernandez and Thomas were jointly participating in the sale of narcotics. Investigators subsequently conducted trash pulls from trash cans located at a residence on Reservoir Road. The fruits of the trash pulls included papers bearing Thomas's name, as well as items that are commonly used by those engaging in narcotics trafficking. Through another trash pull conducted on June 18, 2015, officers located a receipt for a $900 money transfer dated June 13, 2015. That receipt identified Thomas as the sender, and it identified the recipient of the money as a woman in Donna, TX, a town near the Mexican border. Said area is a known source of narcotics that eventually arrive in Lima. Surveillance video from Walmart in Lima depicted Thomas's arrival in what he believed to be a 2008 Yukon Denali. The camera footage showed Thomas exiting the vehicle and going immediately to the customer service desk to transfer money. The video showed Thomas leave immediately when the transaction was completed. On September 9, 2015, investigators on the drug task force received a tip from a known and reliable source

that Thomas was observed at the residence of one of his associates. According to the source, Thomas arrived in a 2011 Cadillac and, shortly thereafter, multiple other vehicles also arrived. The source observed multiple bags being removed from other vehicles, and those bags were then placed in the 2011 Cadillac. Based on their training and experience, investigators believed that drug transactions were taking place. (*Id.*).

{¶22} This Court addressed circumstances similar to these in *State v. Urdiales*. *State v. Urdiales*, 3d Dist. Henry No. 7-15-03, 2015-Ohio-3632. In *Urdiales*, the defendant challenged a search warrant which authorized the placement of a GPS tracking device on his vehicle. *Id.* at ¶ 13. Specifically, *Urdiales* argued that the affidavit in support of the search warrant was not sufficient to provide probable cause. *Id.* We upheld the search warrant, noting specifically that the affidavit in that case attested to the reliability of the informant. *Id.* at ¶ 18. In upholding the warrant, we also noted that the affidavit recited the underlying circumstances on which the informant based his belief that criminal activity was occurring. *Id.* at ¶ 19. We further noted that the affidavit included a specific description of the vehicle and its driver. *Id.* at ¶ 21. We followed the conclusion of the Supreme Court of Ohio that observations from an informant may be given added weight by information gleaned from corroborative police surveillance. *Id.* citing *State v. Graddy*, 55 Ohio St.2d 132, 139-140 (1978).

{¶23} Similar facts prevail here. Though the affidavit at issue does not go into great detail about the informant, it minimally describes him as a "known" and "reliable" source. (State's Ex. 1). However, apart from any mention of the informant, and apart from the excised second paragraph of the affidavit, the voluminous affidavit recounts extensive observations by multiple law enforcement officers as well as the conclusions, based on the training and experience of those officers and the affiant, that Thomas was likely engaging in drug trafficking. (State's Ex. 1). Based on the reasoning above, we conclude that the warrant was supported by probable cause.

{¶24} Even if we did not find that the affidavit furnished probable cause to issue the warrant, we would still be compelled to uphold the search at issue here, as we find no indication of any of the factors that would remove the search here from the good faith exception articulated in *Leon*. Thus, we conclude that the good faith exception is applicable even if the search is otherwise invalid. *George* at 331-332.

{¶25} For the foregoing reasons, Thomas's third assignment of error is overruled.

**Assignment of Error No. IV**

**The Trial Court Erred In Overruling Thomas'[s] Motion to Suppress II (October 15, 2015 Detention and Search) And Its Fruits Obtained From Said Evidence, Having Been Obtained As A Result Of A Warrantless Search, Which Resulted In Unreasonable Searches And Seizures Under the Fourth Amendment Of The Ohio And United States Constitution[s].**

{¶26} In his fourth assignment of error, Thomas argues that the trial court erred in denying his second motion to suppress evidence because evidence was gathered without a warrant, rendering the search unreasonable under the Ohio and United States Constitutions. Specifically, Thomas argues that the trial court erred in overruling his second motion to suppress evidence because the trial court admitted evidence in violation Evid.R. 803(5) in the determination of that motion. (Appellant's Brief at 20). Thomas further argues that the trial court erred by relying on facts that were not supported by competent and credible evidence and that, as a result, it applied the wrong legal standard in the determination of the motion. (*Id.* at 20-21). Thomas further asserts that the trial court erred in denying his second motion to suppress because the State conducted a warrantless search when it used a drug-sniffing dog to search Thomas's vehicle, which was parked in the curtilage of his home. (*Id.* at 21). Thomas further avers that, should we conclude that his vehicle was not in the curtilage of his home and thus that the alleged search necessitated no warrant, the State was still without probable cause and reasonable suspicion to search the vehicle, and thus the State's search of Thomas and of his vehicle was improper. (*Id.* at 22).

{¶27} We are guided by the same standard of review that we applied in addressing Thomas's third assignment of error.

{¶28} The interests at stake in a suppression hearing are of a lesser magnitude than those in a criminal trial. *United States v. Raddatz*, 447 U.S. 667, 679, 100 S.Ct. 2406, 2414 (1980). It is well-established that, at a suppression hearing, the trial court may rely on evidence even though that evidence would not be admissible at trial. *Maumee v. Weisner*, 87 Ohio St.3d 295, 298 (1999). The rules of evidence do not apply in suppression hearings. *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, ¶ 17, citing Evid.R. 101(C)(1) and 104(A).

{¶29} Based on the principles above, we cannot say that the trial court erred in admitting evidence despite the fact that such evidence was arguably inadmissible under Evid.R. 803(5). The Supreme Court of Ohio expressly permits the admission of evidence at suppression hearings despite the fact that the same evidence would not be admissible at trial. *See State v. Edwards*, 107 Ohio St.3d 169, 2005-Ohio-6180, ¶ 15 (concluding that a magistrate "was not precluded from considering * * * [evidence] even if the Rules of Evidence governing authentication and hearsay would preclude admission of the [evidence] at trial"). Therefore, we conclude that Thomas's argument that the trial court erred in admitting and relying on evidence precluded by Evid.R. 803(5) is meritless. *See Edwards* at ¶ 15.

{¶30} Next, we will address Thomas's argument that the trial court erred by relying on facts not in evidence and by applying the wrong legal standard in the determination of the motion.

{¶31} The task of the trial court in this case was to determine whether probable cause existed for the search of Thomas's vehicle. "Probable cause" means less evidence than would permit condemnation such that only probability, and not a showing of criminal activity, is the standard of probable cause. *George* at 329.

{¶32} At the suppression hearing on March 7, 2016, the State called Officer Jesse Harrod of the Lima Police Department ("Officer Harrod"). (March 7, 2016 Tr. at 3). Officer Harrod testified as follows: In March or early April of 2015, the drug task force began to get multiple tips related to Marvin Thomas Jr., Thomas's son. (*Id.* at 4). Based on those tips, authorities obtained a warrant for a 2008 Cadillac that Thomas Jr. frequently drove. (*Id.*). During the course of tracking that vehicle, authorities noted that it would make frequent trips to a Reservoir Road address, either directly before or directly after trips to Columbus—a city through which drugs destined for Lima often come. (*Id.*).

{¶33} Officer Harrod testified that the drug task force conducted a "trash pull" outside that Reservoir Road address on April 30, 2015, examining the contents of trash cans that had been set out in a grassy area for collection. (*Id.* at 17.). He said that items recovered from the trash pull included multiple pieces of paperwork with Thomas's name, four thousand-dollar money bands, carbon paper trimmings, two empty carbon paper sleeves, scented perfume strips, and a sealable bag containing a substance that tested positive for marijuana. (*Id.* at 17-18). Officer

Harrod testified that the items recovered are used by those engaged in drug activity. (*Id.* at 18.).

{¶34} Officer Harrod said that one of the items recovered from the trash pull was a receipt bearing Thomas's last name and what was determined to be a Verizon phone number. (*Id.* at 19). He said that the subsequent search of phone records pertaining to that number revealed multiple text messages to and from said number indicative of large amounts of money and drug trafficking. (*Id.* at 20). Some of the text messages were determined to be between Thomas and Anthony Duvernay ("Duvernay"). (*Id.* at 20).

{¶35} Officer Harrod testified that a trash pull at the Reservoir Road address on May 14, 2015 produced a bank statement with Thomas's name, dryer sheets, a burnt marijuana cigarette, a receipt for a pre-paid phone, carbon paper remnants, and five one-thousand-dollar money bands despite the fact that Thomas did not appear to have any kind of legal employment at any time during the investigation. (March 7, 2016 Tr. at 22). Officer Harrod specifically asserted that dryer sheets and carbon paper are often used to mask the odor of drugs. (*Id.*). He said the trash pull also produced torn plastic bags of the kind drug dealers and users use to carry drugs. (*Id.*). Officer Harrod testified that other evidence from the trash pull included packaging for yet another cell phone, as well as a 1,500-count box of Sweet & Low, which he said could be used to cut narcotics. (*Id.* at 23).

{¶36} Officer Harrod averred that, on May 29, 2015, investigators began to use a camera affixed to a utility pole—commonly called a "pole camera"—to observe Thomas's residence. (*Id.* at 24). That camera had been placed on public property near his residence. (*Id.*). He asserted that, by using the pole camera, investigators were able to observe what they believed to be a Jeep Grand Cherokee park near Thomas's residence. (*Id.* at 25). A few minutes later, a black four-door vehicle backed the entire length of the driveway from the Reservoir Road residence until it reached the parking spot next to the Jeep, at which point Duvernay exited the Jeep, spoke with the occupants of the other vehicle, and removed a duffel bag from the back of his Jeep. (*Id.*). He then placed that bag in the back of the black vehicle; Duvernay then removed a box from the black vehicle and placed it in his Jeep, at which point the two vehicles immediately left the area. (*Id.*). Officer Harrod said that, based on the observations of the investigators, the interactions of Duvernay and the occupant of the second vehicle were consistent with a drug activity. (*Id.* at 25-26). Officer Harrod testified that the pole camera detected a very similar interaction on June 10, 2015. (*Id.* at 26-27). Officer Harrod asserted that a criminal check of Duvernay indicated that he too had a criminal history; it involved trafficking in large amounts of marijuana and even included a federal drug-related conviction. (*Id.* at 30).

{¶37} Officer Harrod then testified that another trash pull, this one on June 18, 2015, produced a receipt for a money transfer dated five days earlier. (*Id.* at 31). The receipt listed Thomas as the sender and identified his address as 117 Pierre Street in Lima. (*Id.* at 30). Officer Harrod asserted that the receipt indicated that the amount of the transfer was $900 and that the receipt identified the recipient as a woman in Donna, Texas—a town near the Mexican border. (*Id.* at 30-31). Officer Harrod asserted that Texas, and specifically the area of Texas near Mexico, is the origin of narcotics that end up in Lima. (*Id.* at 31).

{¶38} Harrod further testified that, on July 16, 2015, another trash pull was conducted, and this one produced a Verizon cell phone and a corresponding receipt; authorities found this significant because drug dealers are known to use multiple cell phones. (March 7, 2016 Tr. at 33). Another trash pull two weeks later produced packaging for another cellular phone. (*Id.* at 34). Yet another trash pull on August 6, 2016 produced a one-thousand-dollar money band. (*Id.*). Officer Harrod testified that another trash pull on August 20, 2016 yielded a small bag of marijuana, a plastic sandwich bag with the corner torn off, and another bag of suspected marijuana, and Officer Harrod explained that high-level drug dealers often use packaging material to ship and receive drugs. (*Id.* at 34).

{¶39} Officer Harrod also testified that he and Investigator Lauk ("Lauk") spoke with an ex-girlfriend of Duvernay, and she was believed to be reliable because

the officer corroborated much of the information she provided and already knew some of what she discussed with them. (*Id.* at 35). According to Officer Harrod, the woman spoke about Duvernay's dealing large amounts of marijuana and shipping out large amounts of money; she also described both Thomas and his vehicles, and she said that there were various meetings between Duvernay and Thomas at which Duvernay gave $2,000 or $3,000 at a time to Thomas. (*Id.* at 35).

{¶40} Officer Harrod testified that, on September 10, 2015, he received a warrant from a Columbus court to place a GPS on Thomas's Cadillac, and he asserted that the GPS was installed in Columbus shortly after the warrant was signed. (*Id.* at 38). Officer Harrod testified that the GPS indicated that, upon returning to Lima from Columbus on September 11, 2015, the Cadillac traveled to the area of a known address on Daniels Avenue in Lima. (*Id.* at 38). Officer Harrod testified that, also on September 11, 2015, investigators observed Thomas and Duvernay travel to a specific address on East Elm Street in Lima. (*Id.* at 39). Officer Harrod averred that the residence on East Elm Street was associated with a particular person who had multiple drug convictions and who seemed actively involved in trafficking drugs. (*Id.* at 39-40).[3] Officer Harrod testified that a search of the house

---

[3] Officer Harrod specifically testified that investigators stopped a man as he departed the address on East Elm Street at a time during which a suspected drug dealer was known to be there. (March 7, 2016 Tr. at 39). Officer Harrod testified that the man investigators stopped was found to be in possession of approximately one pound of marijuana, which the man claimed to have gotten from the individual in the address on East Elm Street. (March 7, 2016 Tr. at 39).

on East Elm Street revealed many items indicative of drug-related activity, including marijuana residue, nearly $4,000, video equipment, and a cellular phone with a text message that read simply "1012 Daniels." (*Id.* at 41).

**{¶41}** Officer Harrod testified that, on September 24, 2015, officers conducted a traffic stop of a vehicle driven by Travis Williams ("Williams") as it left an address on Daniels Avenue in Lima, and that stop and subsequent search of the vehicle revealed fifteen pounds of marijuana. (March 7, 2016 Tr. at 41). Officer Harrod then testified that officers observed Thomas's Yukon Denali parked on the street in front of the residence and saw a male exit the residence and get into the vehicle before the Denali left the scene. (*Id.* at 41-42). Officer Harrod averred that a subsequent search of the residence produced an additional twenty-five pounds of marijuana, two handguns, and other drug-related evidence. (*Id.* at 42). Officer Harrod testified that a search of the cellular phones Williams carried on his person revealed multiple numbers listed under the name "Marv" or variations thereof and that the search also indicated Williams had made a 40-second phone call to someone named "Marv" at approximately the same time the traffic stop occurred. (*Id.* at 42-43). Officer Harrod testified that a recording of a subsequent interview of Williams detected Williams saying "Marvin ain't gonna get that weed." (*Id.* at 43-44).

**{¶42}** Officer Harrod testified that, on October 14, 2015, the pole camera at Thomas's residence detected Duvernay and his girlfriend arriving at the residence

and entering it empty-handed, then departing a few minutes later with a bag that was placed in the back of Duverney's Jeep. (*Id.* at 46). According to Officer Harrod, the video then showed Thomas, driving his Cadillac, following close behind Duvernay as the two left the area. (*Id.*). Officer Harrod next said that, because of what the pole camera observed, investigators headed toward the house and monitored the movements of both Duvernay and Thomas, both of whom traveled directly to Duvernay's home. (*Id.* at 47). Officer Harrod testified that, once the two arrived at Duvernay's home, Duvernay removed the bag from the back of his Jeep and carried it into his house. (*Id.* at 47-48). Officer Harrod asserted his belief, based on his training and experience, that the activity investigators observed on October 14, 2015 was drug activity. (*Id.* at 48-49). Officer Harrod testified that a similar series of events occurred on October 15, 2015. (*Id.* at 51-53). Officer Harrod averred that he and the task force made the decision to conduct a stop of Thomas's vehicle on the basis of everything he previously testified to. (*Id.* at 54).

{¶43} The State's next witness was Deputy Shawn Feldner ("Deputy Feldner") of the Allen County Sheriff's Department. (March 7, 2016 Tr. at 60). On direct examination, Deputy Feldner identified State's Exhibit 2 as the various certifications for his K-9 unit Zeus, which he received on April 24, 2015. (*Id.* at 63).

{¶44} Deputy Feldner testified that Investigator Haines contacted him and explained that the task force was searching for a black Cadillac CTS traveling northbound on Bowman Road. (*Id.* at 66-67). Deputy Feldner testified that Investigator Haines wanted him to conduct a probable cause stop of the vehicle. (*Id.* at 67). Deputy Feldner testified that the driver of the vehicle was Thomas and that the stop of the vehicle took place in Thomas's driveway. (*Id.* at 68-69). According to Deputy Feldner, Zeus indicated that the odor of narcotics was emanating from the Cadillac. (*Id.* at 70). Deputy Feldner testified that a search of the interior portion of the vehicle revealed a bag that appeared to contain heroin, as well as a set of digital scales, with the entire stop being in the camera footage that he identified as being contained on State's Exhibit 1. (*Id.* at 72). Deputy Feldner said Thomas was then placed in custody for suspected heroin possession. (*Id.* at 73).

{¶45} We have no trouble concluding that the trial court did not err in this case. Ohio appellate courts have found evidence of the kind we have reviewed above to be competent and credible, even where the evidence was far less voluminous than we have described. *State v. Cook*, 3d Dist. Putnam No. 12-02-12, 2003-Ohio-1794, ¶ 9-12 (holding that a trial court's finding of probable cause was based on competent and credible evidence where two trash pulls revealed drug residue and other evidence of drug activity such as torn plastic bags and where surveillance by police revealed extensive contact between the defendant and known

drug dealers). As we have detailed above, this case involved extensive evidence of drug activity from numerous trash pulls, as well as surveillance indicating multiple contacts between Thomas and various drug dealers, both at Thomas's home and elsewhere. We conclude that the trial court based its finding of probable cause on competent and credible evidence in this case, and we therefore find that the trial court did not err in denying Thomas's motion to suppress evidence.[4]

**{¶46}** Thomas's next argument is that the trial court erred in denying his motion to suppress evidence gleaned from a warrantless search of his car when it was allegedly located in the curtilage of his home. A review of Thomas's second motion to suppress and the supplement to it reveals that, despite extensive arguments about whether an alert by a drug-sniffing dog constitutes a search and about illegally obtained evidence, Thomas never argued in his motion that the sniff by the dog should be considered a search of his home because the car was located in the curtilage of his home when the alleged search occurred.[5] (*See* Doc. No. 24). The transcript of the relevant hearing is likewise bereft of that issue. (*See* March 7,

---

[4] As an aside, we note that the trial court references a stop justified by the fact that Thomas was driving under a suspended license. (Doc. No. 113). Thomas alleges that evidence of the same does not appear in the record. (Appellant's Brief at 20-21). While we agree with this contention, we addressed the relevant assignment of error by relying on facts that do not include any traffic violation, and we presume, based on the transcript, that the trial court's mention of such a violation was simply a misstatement.

[5] We are referring here to the supplement attached to the back of Thomas's second motion to suppress but which references illegally obtained evidence, a topic discussed in Thomas's third assignment of error which, by its terms, relates to the fourth motion to suppress.

-26-

2016 Tr. at 58, 75-84). We therefore conclude that Thomas has waived this issue on appeal. *State v. Shindler*, 70 Ohio St.3d 54, 58 (1994).

**{¶47}** Thomas also argues that, even if his vehicle was not in the curtilage of his home when officers searched it, the State was still without both probable cause and reasonable suspicion to detain Thomas and search his vehicle. In discussing whether the trial court relied on facts not in evidence and applied the wrong legal standard in ruling on Thomas's motion, we discussed at length the reasons for which we concluded that the trial court based its finding of probable cause on competent and credible evidence of Thomas's criminality. Specifically, multiple trash pulls revealed drug residue and extensive evidence of drug activity, and police surveillance indicated multiple contacts between Thomas and drug dealers, both at his home and elsewhere. The vehicle that was stopped had been used in what officers believed to be drug activity. (March 7, 2016 Tr. at 46-49). We therefore conclude that the trial court's finding of probable cause was based on competent and credible evidence.

**{¶48}** Police may stop and investigate unusual behavior, even when probable cause for an arrest does not exist, provided that police reasonably conclude that an individual is engaged in criminal activity. *State v. Andrews*, 57 Ohio St.3d 86, 87 (1991). Such stops are permissible provided that police can point to specific and articulable facts that, when taken together with reasonable inferences from those

facts, reasonably warrant an intrusion. *Id.* citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968). This standard is an objective one—whether facts available to police at the time of search or seizure warrant a person of reasonable caution in the belief that the action taken was appropriate. *Id.* citing *Terry* at 21-22.

{¶49} Because we have concluded that the trial court did not err in finding probable cause existed in this case, we need not concern ourselves with whether there was reasonable suspicion necessary for the stop, as a finding of probable cause necessarily includes a finding of reasonable suspicion. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 23 (noting that, if the state has probable cause, it also has reasonable and articulable suspicion). Therefore, we find Thomas's argument that law enforcement did not have reasonable and articulable suspicion to seize him and search his vehicle to be without merit.

{¶50} For the foregoing reasons, Thomas's fourth assignment of error is overruled.

### Assignment of Error No. V

**The Trial Court Erred In Overruling Defendant's Motion to Suppress III (Pole Cameras) And Its Fruits Obtained From Said Evidence, Having Been Obtained Without A Warrant Supported By Probable Cause, Which Resulted in Unreasonable Searches and Seizures Under the Fourth Amendment of the United States [sic] Constitution.**

{¶51} In his fifth assignment of error, Thomas argues that the trial court erred in denying his third motion to suppress, this one pertaining to footage gleaned from

pole cameras installed outside his home, because the operation of those cameras constituted a warrantless search of the home in violation of the Fourth Amendment. (Appellant's Brief at 24). Specifically, Thomas argues that the constant video surveillance of his home over a period of several months with a camera that could be turned, zoomed in, and watched from great distance away with an iPad or cellular phone is not akin to observations with the naked eye and thus amounts to an unreasonable search within the meaning of the Fourth Amendment. (*Id.* at 24-26).

{¶52} We apply the same standard of review that we articulated above in discussing Thomas's third assignment of error.

{¶53} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect individuals against unreasonable searches and seizures by the government, and they protect privacy interests where an individual has a reasonable expectation of privacy. *State v. Fielding*, 10th Dist. Franklin Nos. 13AP-654 and 13AP-655, 2014-Ohio-3105, ¶ 15, quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99S.Ct. 2577 (1979). An expectation of privacy is protected where an individual has manifested a subjective expectation of privacy and that expectation is one that society recognizes as reasonable. *Id.*, citing *Smith* at 740, citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). While the Fourth Amendment does not specifically provide that unlawful searches and seizures will result in the suppression of ill-gotten evidence,

the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment. *State v. Jenkins*, 3d Dist. Union No. 14-10-10, 2010-Ohio-5943, ¶ 9, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684 (1961) and *Weeks v. United States*, 232 U.S. 383, 394, 34 S.Ct. 341 (1914).

{¶54} "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809 (1986). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. U.S.*, 389 U.S. 347, 351, 88 S.Ct. 507 (1967). In general, the police may observe what can be seen from a public vantage point where they have a right to be. *Florida v. Riley*, 488 U.S. 445, 449, 109 S.Ct. 693 (1989).

{¶55} In *Riley*, the Supreme Court of the United States addressed a situation in which a police officer observed marijuana in a green house on Riley's property while flying over in a helicopter. *Id.* at 448. From that vantage point, the officer observed marijuana growing in a green house that had not been entirely covered. *Id.* In concluding that such observation was not a search within the meaning of the Fourth Amendment, the Court noted that any member of the public could have been flying over Riley's residence and could have observed the same thing that officers

saw. *Id.* at 451. The Court found it important that officers were not breaking the law when they observed the marijuana in question. *Id.*

{¶56} Facts similar to those in *Riley* are now before us. Our review of the exhibits indicates that the pole camera observed the exterior portion of Thomas's home. (State's Ex. 17, 18).

{¶57} At the suppression hearing on February 22, 2016, Investigator Michael Haines ("Investigator Haines") testified. (Feb. 22, 2016 Tr. at 4). Investigator Haines asserted that American Electric Power ("AEP") installed the pole camera on one of its own poles. (*Id.* at 26-27). The camera has no night vision. (*Id.* at 29). Investigator Haines identified State's Exhibit 18 as a picture taken by the pole camera at night. (*Id.*); (State's Ex. 18). According to Investigator Haines, the pole camera depicted the driveway of the Reservoir Road home and part of the exterior of the residence, but the camera could not see into the residence through any doors or windows and, more broadly, could not see anything that could not also be observed from the road or from near-by residences. (Feb. 22, 2016 Tr. at 32-33). Investigator Haines identified State's Exhibit 17 as a daytime photo of the residence as the pole camera showed it. (*Id.* at 33); (State's Ex. 17).

{¶58} Here, as in *Riley,* the record reflects that the view of Thomas's home through the pole camera was the same view that any neighbor or passer-by could enjoy. Further, the state was certainly not violating any legal provisions by placing

the camera on the pole, as the camera was actually placed by AEP on one of its own poles.

{¶59} Federal appellate courts have specifically found that there is no reasonable expectation of privacy in what is observed by a pole camera located on a public utility pole provided that camera captures the same views observable to a passerby on public property. *United States v. Houston*, 813 F.3d 282, 287-288 (6th Cir.2016). Applicable federal precedent has also held that the use of technology more versatile than the naked eye to conduct surveillance over an extended period of time does not alter the analysis, as the Fourth Amendment does not punish law enforcement for being efficient or for making use of new technologies. *Id.* at 288.

{¶60} Based on the principles above, we conclude that the trial court did not err in denying Thomas's motion to suppress the evidence obtained through the use of pole cameras.

{¶61} For the foregoing reasons, Thomas's fifth assignment of error is overruled.

## Assignment of Error No. VI

**Thomas Was Deprived Of Due Process Of Law And A Fair Trial When The State Failed To Specify In The Indictment Unindicted Offenses As Predicate Offenses For Count Four, Engaging In A Pattern Of Corrupt Activity, U.S. Const. Amends VI, XIV, Ohio Const. I, Sec. 10**

{¶62} In his sixth assignment of error, Thomas argues that the trial court erred in denying his motion to dismiss Count Four because Count Four did not identify the enterprise of which Thomas was allegedly a part, nor did it identify the predicate acts that the State intended to prove in order to establish a pattern of corrupt activity. (Appellant's Brief at 28). Specifically, Thomas argues that the State's failure to include such details in the indictment denied Thomas due process of law because the indictment did not put him on notice as to what the State would seek to prove at trial. (*Id.* at 27-28).

{¶63} A criminal indictment serves several purposes, one of which is that, by compelling the government to aver all material facts amounting to the essential elements of an offense, an indictment affords a defendant with notice of the charges against him and the opportunity to defend himself. *State v. Childs*, 88 Ohio St.3d 194, 198 (2000), citing *State v. Sellards*, 17 Ohio St.3d 169, 170 (1985). In general, an indictment is sufficient if it recites the language of the applicable criminal statute and also states the numerical designation of the statute that the defendant is alleged to have violated. *State v. Reinhart*, 3d Dist. Van Wert No. 15-06-07, 2007-Ohio-2284, ¶ 14, citing *State v. Siferd*, 151 Ohio App.3d 103, 2002-Ohio-6801, ¶ 22 (3d Dist.). Because an indictment for a violation of R.C. 2923.32(A)(1) requires the State to rely on predicate acts, notice of the acts to be proven must be included in the indictment. *Siferd*, at ¶ 23, citing *State v. Burkitt*, 89 Ohio App.3d 214, 224 (2d

Dist.1993). Where unindicted offenses are used to establish a pattern of corrupt activity, the identification of the predicate acts in the indictment provides some assurance that the defendant was indicted based on the same acts for which he was tried and convicted. *Id.*

{¶64} The adequacy of an indictment is a question of law, which we review de novo. *State v. Mason*, 3d Dist. Marion No. 9-16-34, 2016-Ohio-8400, ¶ 17, citing *State v. Hernon*, 9th Dist. Medina No. 2933-M, 2000 WL 14009, *2 (Dec. 29, 1999).

{¶65} We addressed facts similar to these previously. *State v. Roberson*, 3d Dist. Hancock No. 5-02-45, 2003-Ohio-4627. In *State v. Roberson*, we addressed a situation in which the defendant claimed that he was denied due process of law because the indictment for a violation of R.C. 2923.32(A) did not specify the predicate acts underlying the charge. *Id.* at ¶ 7. We noted that the bill of particulars and an amended bill of particulars filed in *Roberson* were more specific as to the conduct alleged in the indictment and gave the defendant ample time to prepare a defense. *Id.*

{¶66} Similar facts exist here. Count Four of the indictment alleged that Thomas engaged in a pattern of corrupt activity and recited the language of the statute. R.C. 2923.32(A)(1); (Doc. No. 1). It did not, however, specify the predicate offenses for that charge. (Doc. No. 1). The State filed a bill of particulars on December 2, 2015 in which it specified a range of dates during which Thomas

-34-

allegedly engaged in a pattern of corrupt activity and specifically said that the predicate offenses were those charged in Counts One, Two, and Three, as well as uncharged instances of possession of and trafficking in marijuana in quantities constituting at least felonies of the third degree. (Doc. No. 38). The same document further described the details of the narcotics enterprise in which Thomas was allegedly involved, though that enterprise had no formal name of which the State was aware. (*Id.*). At the time the State filed that bill of particulars, the trial was scheduled for March 8, 2016, but it was subsequently rescheduled for March 22, 2016. (Doc. No. 43). This is to say that the bill of particulars specifying the predicate offenses was furnished to Thomas more than three months before his trial, giving him ample time to prepare a defense.

{¶67} For the foregoing reasons, Thomas's sixth assignment of error is overruled.

### Assignment of Error No. I

**The Trial Court Denied Thomas The Right To Effective Assistance Of Counsel Free From An Actual Conflict Of Interest When It Did Not Substitute Counsel For Thomas, In Violation of the Sixth And Fourteenth Amendments To The United States Constitution And Section 10, Article I Of The Ohio Constitution.**

### Assignment of Error No. II

**Thomas's Trial Counsel Had An Actual Conflict Of Interest When He Represented Thomas, In Violation Of Thomas's Sixth Amendment Right To Effective Assistance of Counsel.**

{¶68} In his first assignment of error, Thomas argues that the he was denied effective assistance of trial counsel free from a conflict of interest when the trial court did not substitute trial counsel for Thomas, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article 1 of the Ohio Constitution. (Appellant's Brief at 10). Specifically, Thomas argues that his trial counsel also represented the previously identified Travis Williams and that this created a conflict of interest for three reasons: (1) the State indicated that it intended to offer Williams a plea deal in exchange for his cooperation against Thomas; (2) the State had proffered to Thomas, and any potential negotiated plea agreement at which the State and Thomas might arrive would impugn Williams's interests; and (3) the discovery for each of Thomas's trial counsel's clients included information that damaged the interests of the other client. (*Id.* at 10-11). Put simply, Thomas argues that there was a conflict of interest because his trial counsel represented clients with opposing interests at the same time.

{¶69} In his second assignment of error, Thomas argues that his trial counsel had an actual conflict of interest when he represented Thomas, in violation of the Sixth and Fourteenth amendments to the United States Constitution and Section 10, Article 1 of the Ohio Constitution. (*Id.* at 11). Specifically, Thomas argues that, under Prof.Cond.R. 1.9, Thomas's trial counsel, who ceased to represent Williams,

could not continue to represent Thomas because Thomas's interests were materially adverse to those of former client Williams (*Id.* at 12).

**{¶70}** A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*

**{¶71}** Sixth Amendment jurisprudence holds that, where a right to counsel exists, there is also a right to effective counsel free from conflicts of interest. *State v. Johnson*, 185 Ohio App.3d 654, 2010-Ohio-315, ¶ 3 (3d Dist.), citing *State v. Gillard*, 64 Ohio St.3d 304, 311 (1992), citing *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097 (1981). In order to demonstrate a Sixth Amendment violation, a defendant alleging ineffective assistance because of a conflict of interest must show that the conflict actually affected the representation. *State v. Bradley*, 3d Dist. Union No. 14-08-27, 2008-Ohio-6071, ¶ 22, citing *State v. Getsy*, 84 Ohio St.3d 180, 187 (1998), citing *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708 (1980).

**{¶72}** Based on the principles above, we conclude that Thomas has not demonstrated a Sixth Amendment violation because of his trial counsel's conflict of interest. In his brief, Thomas does not even assert that his trial counsel's conflict affected his representation of Thomas (Appellant's Brief, 10-13). During oral argument, Thomas's appellate counsel likewise made no reference to any effect that the conflict might have had on the representation of Thomas at trial other than to assert, without more, that there was an effect.

**{¶73}** For the foregoing reasons, Thomas's first and second assignments of error are overruled.

**{¶74}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**